In the Matter of Robert William HAGEDORN, Debtor.

FIRST NATIONAL BANK OF CINCINNATI, Plaintiff,

v.

Robert William HAGEDORN, Defendant.

Bankruptcy No. 1–82–00154.
Adv. No. 1–82–105.

United States Bankruptcy Court,
S.D. Ohio, W.D.

Dec. 21, 1982.

See also, Bkrtcy., 25 B.R. 670.

Paul J. Vesper, Covington, Ky., for plaintiff.

Robert A. Goering, Cincinnati, Ohio, for defendant.

### FINDING OF FACT, OPINION AND CONCLUSIONS OF LAW

RANDALL J. NEWSOME, Bankruptcy Judge.

This matter is before the Court pursuant to a complaint filed by the First National Bank of Cincinnati alleging that a debt owed by defendant Robert Hagedorn is not dischargeable in bankruptcy under 11 U.S.C. § 523(a)(2)(A). Pursuant to the December 13 trial held on such complaint, the Court hereby submits its findings of fact, opinion and conclusions of law:

### Findings of Fact

1. In approximately 1964, defendant, Robert Hagedorn was issued a Master Charge [1] credit card. According to his testimony, defendant's balance of charges on this card have almost always been at or near his credit limit.

This testimony is at least partially confirmed by defendant's Exhibit A, which consists of Hagedorn's monthly Master Charge statements from January of 1979 to January of 1982. A review of those statements indicates that during that three year period, defendant's balance was never more than $136.00 below his credit limit. His balance exceeded his credit limit in 9 of the 36 months reviewed. Between January of 1979 and September 2, 1981, defendant charged 16 cash advances on his Master Charge card, ranging in amounts from $50.00 to $200.00.

2. In June of 1981 defendant's marriage was dissolved at his request. Pursuant to the dissolution agreement, defendant is required to pay $500.00 per month in child support for his three children. His take home pay is $568.00 bi-weekly. Defendant was not represented by counsel in the divorce proceeding. Hagedorn's other fixed monthly expenses included $100.00 for rent, $100.00 for transportation, $130.00 for a second mortgage, and $160.00 to $200.00 for food.

3. In October of 1981 defendant sought to obtain a consolidation loan from First National Bank for the purpose of paying off his Master Charge, Visa, Sears and Shillito charge accounts, as well as a previous consolidation loan from First National. Defendant testified that he discussed his fi-

---

1. The terms "Master Charge" and "Master Card" will be used interchangeably in this opinion.

nancial condition with First National, and attempted to arrive at a budget. No evidence was presented by either party regarding what investigation or inquiry First National made regarding defendant's financial status or personal circumstances; nor was any evidence presented as to what representations, if any, Hagedorn made to First National regarding his financial problems and ability to repay the loan.

4. On October 9, 1981 First National issued the consolidation loan to the defendant which he was to repay at $289.51 per month. First National allowed defendant to retain the use of his Master Charge card with the same $1300.00 credit limit he had held previously.

5. Between October 9, 1981 and December 22, 1981 defendant charged $140.57 in purchases and $900.00 in cash advances on his Master Charge. According to his testimony, defendant used these cash advances to help pay a $389.00 damage claim arising out of an automobile accident in which his oldest son was involved. He used part of the cash advance money to make car and life insurance payments of approximately $200.00 and to purchase Christmas presents in the amount of $300.00. Part of the money also went towards his $289.51 monthly consolidation loan payments. Defendant made a payment of $10.00 to Master Charge on November 30, 1981 and another payment of $39.00 on December 29, 1981.

6. Shortly after Christmas of 1981, Defendant realized that he was unable to meet his debts as they became due. He sought the aid of a credit counsellor to formulate a budget, but the effort was unsuccessful. On or about January 4, 1982 he consulted an attorney who discussed the possibility of filing a Chapter 13 plan or a straight bankruptcy under Chapter 7. After mulling over his attorney's advice, on January 20, 1982 defendant directed that a Chapter 7 bankruptcy petition be filed on his behalf.

7. At no time after December 22, 1981 did the defendant incur additional charges on the subject Master Charge.

*Opinion*

The legal principles which have evolved from decisions under § 523(a)(2)(A) are far easier to state than they are to apply. Both parties agree that those principles are as set forth by Judge Timothy S. Hogan in *Livingston v. Hospelhorn*, Civ. No. C–1–82–004 (S.D.Ohio, filed September 29, 1982):

"Under 11 U.S.C. § 523(a)(2), a debt is not dischargeable if the creditor can establish the following elements: (1) that the debtor knowingly made false representations; (2) that the debtor made the representations with the intent to deceive; (3) that the creditor relied on the representations and the reliance, under the circumstances, was reasonable; and (4) that the reliance was the proximate cause of the creditor's loss ... Moreover, the creditor must prove each element by clear and convincing evidence.

See also: *In Re Roeder*, Case No. B–1–76–1672 (Bkrtcy., S.D. Ohio 1977) (Perlman, J.). The burden which the plaintiff must carry in this sort of case is hardly trivial.

Clear and convincing evidence is an intermediate standard of proof in which the evidence establishes a fact to a lesser degree than beyond a reasonable doubt, but establishes a fact to a greater degree than by a mere preponderance of the evidence. In other words, clear and convincing evidence consists of evidence which establishes in the mind of the trier of fact "a firm belief or conviction as to the allegations sought to be established." *Hobson v. Eaton*, 399 F.2d 781, 784 n. 2 (6th Cir.1968) *cert. denied*, 394 U.S. 928, 89 S.Ct. 1189, 22 L.Ed.2d 459 (1969).

The concept of credit card fraud does not fit neatly within the four-part test set forth above, since the use of credit cards normally does not involve express misrepresentations. However, a creditor satisfies the four requirements of § 523(a)(2)(A) in such cases if he establishes by clear and convincing evidence that: 1) the debtor made false representations, in that he made charges on a credit card at a time when he did not have the means to pay for such charges; 2) the debtor intended to deceive

the creditor in that he did not intend to pay for the charges he incurred; 3) the creditor reasonably relied upon debtor's false representations; and 4) the creditor's reliance was the proximate cause of the creditors loss. *See, e.g., In Re Vegh,* 14 B.R. 345 (Bkrtcy., S.D.Fla.1981).

The Court has little difficulty in finding that the bank has established that false representations were made. Hagedorn's fixed monthly expenses as of October 9, 1981 were in excess of $1300., while his income was less than $1200. Simple arithmetic clearly establishes that Hagedorn was not able to pay for the charges he incurred in October, November and December of 1981, at least not in a timely fashion.

However, this same arithmetic calculation makes it equally clear that the bank's reliance upon Hagedorn's false representations was not reasonable. Had the bank inquired into Hagedorn's financial status at the time it processed his $5100.00 consolidation loan, it would have been apparent that the $289.51 monthly payment he was required to make on that loan, when combined with his other monthly expenses, exceeded his monthly spendable income. The record is silent as to whether such an investigation was, or was not made, but the circumstances suggest that it could and should have been made. To allow Hagedorn to retain a $1300.00 credit limit on his Master Charge at a time when it could easily have determined that his expenses exceeded his means constituted negligence on the part of the bank, particularly in light of the purposes for which Hagedorn was seeking the loan of $5100.00. After October 9, 1981 the bank could not reasonably rely upon Hagedorn's implied representations of his ability to pay for charges he incurred on his First National Master Card. The bank's negligent conduct continued in November and December of 1981, when it apparently took no action after Hagedorn failed to pay the full amount of the minimum monthly payment.

■ The common law has long imposed a duty of ordinary care and diligence upon those who seek to recover for fraud. If, by the exercise of a minimum of care and diligence, a creditor could ascertain the truth or falsity of a debtor's representations as to his ability to repay a debt, then the creditor will be precluded from claiming reasonable reliance on such representations if he fails to exercise the requisite degree of caution. The extent of the duty depends upon the relative sophistication of the parties, the nature of the representations, and the ease of conducting an investigation. *Battle v. Reserve Life Ins. Co.,* Ohio App., 83 Ohio L.Abs. 324, 168 N.E.2d 915, 922 (1959).

By way of decisional law, the bankruptcy courts have incorporated the duty of ordinary care into the concept of reasonable reliance under § 523(a)(2)(A). What was said in *In Re Shepherd,* 13 B.R. 367 (Bkrtcy., S.D.Ohio 1981) (Kerr, J.) has equal applicability in this case:

"A necessary element in cases involving false representations, false pretenses, and actual fraud, is reliance by the creditor. And this reliance must be reasonable reliance. [citations omitted] ... Plaintiff's own conduct put it in the position it now complains of. Plaintiff cannot conduct business without due care and then maintain that as a result of deception it extended credit. 13 B.R. at 372.

*See also In Re Breen,* 13 B.R. 965, 968–969 (Bkrtcy., S.D.Ohio 1981) (Kerr, J.); *In Re McKenzie,* Adversary No. 1–81–117 (Bkrtcy., S.D.Ohio, filed 11–2–81) (Gartner, J.).

■ In this case the bank had ample opportunity to investigate Hagedorn's financial status. Even the simplest of inquiries would have revealed his desperate financial problems. Given the size of his October 9, 1981 consolidation loan, as well as the fact that this was the second such loan he had sought, prudence dictated that such an inquiry be conducted. The bank cannot now complain of Hagedorn's false representations, since with the exercise of ordinary care, the bank could have avoided the present controversy altogether.

While the lack of reasonable reliance is fatal to the bank's cause of action, the

Court notes in passing that neither the direct nor circumstantial evidence was sufficient to establish a "firm conviction or belief" that Hagedorn's Master Charge charges after October 9, 1981 were made with an intent to deceive. The direct evidence consisted solely of Hagedorn's testimony. The only distinct picture which emerges from that testimony is that of a man who had never demonstrated a great deal of competence in handling his financial affairs prior to his divorce. After his divorce it appears that he lost both control of his life and contact with reality. It might have been obvious to a dispassionate observer that as of October 9, 1981, Hagedorn was not in a position to repay any additional Master Charge charges for the foreseeable future. But the Court cannot state with a firm belief or conviction that Hagedorn himself had absorbed or comprehended this fact prior to the end of December, 1981.

This is not a "shopping spree" case as was true in *In Re Manuel*, 24 B.R. 744 (Bkrtcy., S.D.Ohio 1982) (Perlman, J.) in which the debtor made 107 purchases in fourteen days; nor is it a case in which the debtor's deceitful intent was apparent from his course of conduct or prior sworn statements. *Cf. In Re Temple*, Case No. B–1–76–1989 (Bkrtcy., S.D.Ohio 1977) (Perlman, J.)

Here, the debtor's conduct was consistent from 1979 onward. Both prior to and after October of 1979, Hagedorn obtained numerous cash advances in order to meet living expenses, and rapidly pushed the balance towards his credit limit. Unlike the situation in *Temple* and *Manuel*, he ceased using his credit card when he first became fully cognizant of his inability to pay his debts and the possibility of filing a bankruptcy petition became a reality. This conduct has the earmarks of a confused, naive man attempting to muddle through his financial difficulties as he always had in the past. It does not have the flavor of deceit.

Having failed to carry the burden of proof as to two of the four requirements under § 523(a)(2)(A), the Court hereby finds in favor of the defendant.

*Conclusions of Law*

1. This Court has jurisdiction over this action under 28 U.S.C. § 1471(a).

2. The debt which the defendant incurred on his Master Charge credit card is not nondischargeable under 11 U.S.C. § 523(a)(2)(A).

a. Plaintiff has established that the debtor was not able to pay for charges he made on his Master Charge after October 9, 1981, and thereby made false representations when he incurred such charges.

b. Plaintiff has failed to establish by clear and convincing evidence that defendant's false representations were made with the intent to deceive.

c. Plaintiff has failed to establish by clear and convincing evidence that it reasonably relied upon such false representations.

3. It is therefore ORDERED that the debt of Robert William Hagedorn to the First National Bank of Cincinnati is determined to be dischargeable and judgment be entered in favor of the defendant.

IT IS SO ORDERED.