In re Terrence M. QUICK and Deborah J. Quick, aka Deborah J. James, Debtors.

CITIBANK (SOUTH DAKOTA), N.A., Plaintiff,

v.

Terrence M. QUICK and Deborah J. Quick, aka Deborah J. James, Defendants.

Bankruptcy No. 85–01429–LM7.
Adv. No. C85–0746–LM7.

United States Bankruptcy Court, S.D. California.

March 3, 1987.

Darvy Mack Cohan, La Jolla, Cal., for plaintiff.

William C. Mathews, San Diego, Cal., for defendants.

### MEMORANDUM DECISION

LOUISE DeCARL MALUGEN, Bankruptcy Judge.

Citibank (South Dakota, N.A.) has brought an adversary complaint under § 523(a)(2) to determine dischargeability of a debt owed by Deborah Quick. Citibank is owed $10,767.33 for purchases made by Quick on two Visa credit cards issued by the bank. Quick denies she obtained the goods and services, intending not to pay for them.

This is a core proceeding as defined by 28 U.S.C. § 157(b)(2).

The facts of this case are not in dispute. In 1982, Deborah and Terrence Quick were married. Both were employed and had a number of credit cards which they used frequently and paid on a current basis.

In July 1983, the couple's baby daughter died from Sudden Infant Death Syndrome. According to the testimony of her former spouse, Ms. Quick underwent a personality change by reason of the baby's death and, despite lengthy psychological counseling, continued to suffer a great deal of emotional distress. She began to abuse tranquilizers and then cocaine. In February 1984, the couple separated, reunited briefly from

July to October 1984, and thereafter separated permanently. Because of her emotional distress after the baby's death, Deborah Quick had ceased working on other than a part-time basis.

In October 1984, because of the accumulated medical bills for the child, the psychologists' bills for counseling and the costs of the lawyers' fees for the dissolution proceedings, Terrence Quick realized there was no way they could pay all of the credit card obligations they then owed. He testified credibly that when he and Deborah separated for the last time, he made no promises to pay the over $6,000 in charge account bills.

On August 3, 1984, Deborah executed a "Pre-Approved Acceptance Certificate" to Citibank, applying for a Visa card with a "pre-approved credit line" of $2,000. Although there was no testimony as to the date this application was received by Citibank, her first Visa card ending in the digits "215" was issued around October 10, 1984. Ms. Quick's uncontroverted testimony was that she received yet another "Pre-Approved Acceptance Certificate" for yet another "pre-approved credit line" of $2,000 at the same time she was sent the "215" card. On October 10, 1984, she executed that application and, in November 1984, received the "317" card. She first started using the "215" card on October 27, 1984, and the "317" card on November 8, 1984. Less than ninety days later, she had used the two cards 232 times, charging an aggregate of $10,767.33.

Ms. Quick has offered a number of explanations for her excessive use of the credit cards during this period of time. Most significantly, she claims that her cocaine addiction prevented her from forming the intent not to pay for the goods and services she purchased on Citibank's Visa cards.

## ISSUES

I. Whether substance abuse by the debtor can prevent formation of the intent to deceive necessary to prove a non-dischargeable debt under § 523(a)(2)(A).

II. Whether Citibank relied on the false representations made by the debtor.

III. Whether the debtor intended not to pay for the purchases and committed actual fraud.

## DISCUSSION

### I

■ In order to obtain a judgment of nondischargeability under § 523(a)(2)(A), a creditor must prove not only that the debtor made false representations when he or she knew them to be false, but also that the debtor made them with the intention and purpose of deceiving the creditor.[1]

■ No court has directly addressed the question of the effect of substance abuse on the formation of the intent to deceive in connection with § 523(a)(2)(A) actions. Only by examination of those cases arising under other Bankruptcy Code sections is any guidance given to this Court.

In addressing the effect of substance abuse on intentional acts in connection with other Bankruptcy Code sections, courts have generally held that addiction is not an excuse for actions or omissions by a debtor. For example, in declining to accept the excuse that the debtor's cocaine addiction prevented him from appearing in proper prosecution of his case and, therefore, his

---

**1.** When the Ninth Circuit Court of Appeals last discussed the standard of proof required in actions of this type, it did so in a case arising under § 17(a)(2) of the Bankruptcy Act. The Court adopted five factors for determining when a debt is non-dischargeable under § 17(a)(2):

    (1) the debtor made the representations;
    (2) That at the time he knew they were false;
    (3) That he made them with the intention and purpose of deceiving the creditors;

    (4) that the creditor relied on such representations;
    (5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.
*In re Taylor,* 514 F.2d 1370, 1373 (9th Cir.1975); *See also, In re Houtman,* 568 F.2d 651, 655 (9th Cir.1978).
There does not appear to be any material difference between § 17(a)(2) and § 523(a)(2)(A).

actions were not "willfull" for purposes of § 109(f), one court observed:

> The debtor's drug addiction was a plight that resulted from his volitional conduct and, as evidenced by his subsequent rehabilitation, was entirely within his control. Substance abuse, in the court's opinion, is indistinguishable from driving under the influence of alcohol, which some courts have found to be "willfull and malicious" conduct for purposes of § 523(a)(6) [citations omitted].

> . . . . .

> His habitual use of cocaine during that proceeding was voluntary and intentional and provides no justification for his conduct. This court concludes the debtor's failure to attend creditors' meetings during his first case constituted a "willfull failure of the debtor to abide by the orders of the court." *In re Correa,* 58 B.R. 88, 90–91 (Bankr.N.D.Ill.1986). .

In the recent opinion of *Dolin v. Northern Petrochemical,* 799 F.2d 251 (6th Cir. 1986), the Court of Appeals observed that even if the debtor's cocaine addiction prevented him from maintaining records, it did not excuse his failure to keep them for § 727(a)(3) purposes since "... a chemical addiction flows from a decision to use narcotics. Such a decision was, at least initially, voluntary." At 253, n. 1.

Most of the cases discussing the effect of substance abuse on the formation of intent arise under § 523(a)(6). They usually involve the question of whether debtors driving while intoxicated can form the intent to willfully and maliciously injure another. Some courts have focused on the debtor's specific intent to injure the complainant and have held that an intoxicated debtor was merely reckless but not intentionally willful and malicious as required by § 523(a)(6). *See, e.g., In re Silas,* 24 B.R. 771 (Bankr.N.D.Ala.1982); *Matter of Morgan,* 22 B.R. 38 (Bankr.D.Neb.1982); *In re Oakes,* 24 B.R. 766 (Bankr.N.D.Ohio 1982). Other courts, particularly in this Circuit, have focused on the element of intent inherent in voluntary intoxication and inferred willful and malicious conduct

from the obvious danger of driving while intoxicated. See *e.g., Matter of Wooten,* 30 B.R. 357, 10 B.C.D. 1029 (Bankr.N.D.Ala. 1983); *In re Ray,* 51 B.R. 236 (9th Cir. BAP 1985).

Although the Ninth Circuit Court of Appeals has not addressed the nature of the intent required in § 523(a)(2)(A) cases, it has considered the nature of intent required for § 523(a)(6) actions. In the recent case of *In re Cecchini,* 780 F.2d 1440 (9th Cir.1986), the court discussed the split in decisional law concerning the interpretation of the phrase "willfull and malicious":

> Some courts have found this phrase to require an intentional act which results in injury, [citations omitted] while others have found it to require an act with intent to cause injury. [citations omitted]. At 1442.

The Court of Appeals went on to adopt the less strict standard which does not require proof that the act was done with the specific intent to cause injury:

> [W]e adopt the plaintiff's suggested interpretation of "willfull and malicious" in 11 U.S.C. § 523(a)(6). When a wrongful act such as conversion, done intentionally, necessarily produces harm and is without just cause or excuse, it is "willfull and malicious" even absent proof of specific intent to injure. At 1443.

Since, in the face of this divergence of opinion over the intent standard, this Circuit has adopted a less strict standard of intent for proof in § 523(a)(6) cases, *a fortiori* the standard which must be applied in § 523(a)(2)(A) cases is the same. Therefore, where the creditor in a § 523(a)(2)(A) action proves the purposeful commission of an act of false representation which necessarily produces harm and upon which the creditor has relied to his loss or damage, the intent to deceive may be inferred. It is not necessary that the creditor also prove the debtor's specific intent to deceive. *See also,* 3 *Collier On Bankruptcy* (15th ed.) para. 523.08, p. 523–44, n. 12.

## II

The next enquiry is whether Citibank has proven the purposeful commission of an act

of false representation. In the context of non-dischargeability actions brought for credit card debt, two lines of case authority have developed.

■ The first line of cases holds that when a credit card is used, the cardholder has made an implied representation that she has the ability and intention to pay for the goods or services charged. *In re Senty,* 42 B.R. 456 (Bankr.S.D.N.Y.1984); *In re Schnore,* 13 B.R. 249 (W.D.Wis.1981); *In re Wilson,* 32 B.R. 772 (Bankr.E.D. Tenn.1983); *In re Lipsey,* 41 B.R. 255 (Bankr.E.D.Pa.1984).

The second line of cases is an outgrowth of the Eleventh Circuit's re-evaluation of the holding in *Davison-Paxon Co. v. Caldwell,* 115 F.2d 189 (5th Cir.1940), *cert. denied* 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941). In the *Davison-Paxon* case, the former Fifth Circuit held that the Bankruptcy Act "... does not except from discharge, debts created by obtaining credit through concealment of insolvency and present inability to pay." *Id.* at 191. The *Davison-Paxon* case involved a "one-on-one" relationship between the debtor and her creditor, in which the creditor knew what was purchased, when and where.

In its decision, *First Nat'l. Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983), the Court of Appeal observed that because of the dramatic growth of transactions in which third parties provide credit services, the concept of intentional concealment had lost its significance. Although the Court of Appeals affirmed the continuing applicability of *Davison-Paxon* to "one-on-one" debtor/creditor relationships, the Court stated that in the context of third party credit transactions, the non-dischargeability analysis:

> [M]ust be guided by the principles underlying *Davison-Paxon* that discharge exceptions are to be narrowly construed and that improvident creditors are not to be afford special protections in bankruptcy for the assumption of common business risks. (At 932).

The *Roddenberry* court went on to hold:

> Bearing in mind these considerations, we hold that the voluntary assumption of

risk on the part of a bank continues until it is clearly shown that the bank unequivocally and unconditionally revoked the right of the cardholder to further *possession and use* of the card, and until the cardholder is aware of this revocation. A card issuer, acting upon its own judgment, may elect to continue to extend credit; it shall be presumed to do so until clear revocation has taken place. Only after such clear revocation has been communicated to the cardholder will further use of the card result in liabilities obtained by "false pretenses or false representations" within the meaning of section 17a(2)'s exemption from discharge. Purchases made with knowledge that one is not entitled to either use or possession constitute the type of deception intended to be exempted from discharge. It is more than an intentional concealment of insolvency; it is an affirmative misrepresentation that one is entitled to possess and use the card. *Id.* at 932. (emphasis in original)

Although the *Roddenberry* case was governed by the Bankruptcy Act of 1898, the court contrasted § 17(a)(2) of that Act with 11 U.S.C. § 523(a)(2)(A) which now provides that actual fraud will likewise except a debt from discharge. The court observed that it appeared the term "actual fraud" added to § 523(a)(2)(A) was an attempt to distinguish between overt and implied misrepresentation. *See Id.* at 929–30 n. 3. However, actual fraudulent misrepresentations by Ms. Quick are not in issue in this case, Citibank having failed to adduce any evidence supporting a finding of actual misrepresentation of ability to pay.

Rather, at issue here is whether the Court should follow the "implied representation" analysis used by many courts in dischargeability actions involving bank credit cards. For the reasons expressed in the *Roddenberry* case, this Court declines to do so. The "implied misrepresentation" analysis protects the creditor who has improvidently issued a credit card to an unqualified cardholder, and permits that cred-

itor to easily obtain a non-dischargeability judgment when that cardholder seeks bankruptcy protection because of her inability to pay. As stated in *Roddenberry:*

The element of risk is inherent in the issuance of bank credit cards.... Once credit cards are issued (if not fraudulently obtained), the bank has agreed to trust the cardholder and to extend credit, and once credit is extended, the bank must decide when and if credit will be revoked. It is not the function of the courts to determine when a bank ought to revoke credit. It also is of little consequence that the bank can show that the terms and conditions said to apply to the use of the card have been violated. The mere breach of credit conditions is of minimum probative value on the issue of fraud because banks often encourage or willingly suffer credit extensions beyond contractual credit limits. Indeed, banks have a definite interest in permitting charges beyond established credit limits because of the high finance charges typical in such transactions. [citations omitted]. Banks are willing to risk non-payment of debts because that risk is factored into the finance charges. Because the risk is voluntary and calculated, section 17a(2) should not be construed to afford additional protections for those who unwisely permit or encourage debtors to exceed their credit limits. (At 932).

█ Citibank asks this Court to infer misrepresentation of Ms. Quick's ability to pay from her hopeless insolvency at the time she obtained the cards. Yet, an examination of Citibank's conduct before issuing those cards reveals that Citibank made no attempt to ascertain what her ability to pay might have been before it issued the cards.

Thomas Taylor, a Citibank account manager, testified that it was Citibank's policy to determine an applicant's credit worthiness before the applicant received the card. No TRW search or other corroborative evidence of a credit check of Ms. Quick was introduced. Had Citibank actually checked Ms. Quick's credit record *before* issuing her

a Visa card in October 1984, it would have discovered the following facts:

1. Her Great American Federal Visa account was five months delinquent; the account was over its limit as of the statement issued June 21, 1984. [Exhibits 8(A)–(B)].

2. Ms. Quick's Walker Scott account was five months delinquent, and was purportedly reported to a credit bureau in early September 1984. [Exhibits 9(A), (B) and (C)].

3. Her Shell Oil credit card was one month delinquent and had been paid with an insufficient funds check in August 1984. [Exhibits 11(A), (B) and (C)].

4. Ms. Quick's Mervyn's account was four months delinquent, with a so-called "final demand letter" having issued on September 13, 1984. [Exhibits 12(A), (B) and (C)].

5. Her Sears Roebuck & Company account was three months delinquent, and her account privileges were suspended by Sears on September 18, 1984. [Exhibits 13(A), (B) and (C)].

6. Ms. Quick's Robinson's charge account was four months delinquent, and her account was closed by Robinson's on September 2, 1984. [Exhibits 14(A), (B) and (C)].

7. Her May Company account was four months delinquent, and this delinquency was supposedly reported to a credit bureau on August 11, 1984. [Exhibits 15(A), (B) and (C)].

8. Ms. Quick's California First Bank Mastercharge account was three months delinquent, and her Mastercharge card was cancelled on September 5, 1984. The account limit on the card was exceeded on June 8, 1984, and at no time up to its cancellation was that over-limit condition cured. [Exhibits 17(A), (B) and (C)].

9. Finally, Ms. Quick had three insufficient funds checks outstanding to Von's grocery store as of July 1984. [Exhibit 18].

A credit check performed on or about October 1, 1984, would have revealed the above-described condition for eight of the

ten credit cards Ms. Quick possessed. Therefore, the claim that Citibank followed its customary credit check procedures with respect to Ms. Quick is not credible.

Whether issuance of these credit cards to Ms. Quick without a credit check was improvident is not for this Court to decide, but in issuing the card without one, Citibank undertook the risk of non-payment. That risk continued until it revoked Ms. Quick's rights to use the card, which occurred on the "215" account with the January 14, 1985 statement. It never occurred on the "317" account. Once notified of the suspension of her account privileges, Ms. Quick did not use the "215" account after the January 14 statement.[2]

As stated by Judge Kahn in a similar situation in *Matter of Carpenter,* 53 B.R. 724 (Bankr.N.D.Ga.1985):

> A credit card company has the absolute right to revoke its credit card. It also has complete control over setting the credit limit for its accounts. As long as credit card companies insist on sending out pre-printed "invitations" to apply for their credit card with the credit limits already appearing on the "invitation", the Court will assume that the company has voluntarily undertaken the risk of non-payment. Further, the Court must also assume that when a credit card company issues a credit card with no credit check of the applicant, it has made a calculated business decision to assume the risk of non-payment. Such a company cannot now turn to this Court and ask for special consideration because the debt owed is being discharged in bankruptcy. (At 728–29).

Since there were no charges to an account for which Citibank had revoked charging privileges, under the *Roddenber-*

*ry* analysis, Ms. Quick incurred no debts to Citibank through false pretenses or false representations of her ability to pay.

### III

■■■ As stated above, the *Roddenberry* case still leaves open the question of whether actual fraudulent conduct by the debtor would result in a non-dischargeable debt. In the opinion of this Court, the statutory mandate of § 523(a)(2)(A) is that when actual fraud is proved, the debts incurred as a result of the fraud should be determined non-dischargeable. In order to prove actual fraud, the creditor must establish by clear and convincing evidence the five factors enunciated in the *Taylor* case, *supra.*

■ Citibank charges that Ms. Quick had no intent to pay for the charges she incurred and asks this Court to imply her intent to defraud from her admittedly hopeless insolvency at the time she made the charges.[3] However, as observed by the court in *Matter of Carpenter:*

> Plaintiff would have the Court "bootstrap" the fact that Defendant-Debtor was having financial difficulty into an intent to defraud Plaintiff. This is what is wrong with the "implied representation" analysis; intent to defraud is too easily implied from the fact that debtor was having financial problems. 53 B.R. at 729.

Concededly, proof of a debtor's actual intent not to pay for charges incurred is difficult. Citibank cites to a number of cases establishing factors from which the Court may infer an intent not to pay, including:

---

**2.** All transactions appearing on the February 13, 1985 statement for the "215" account bear transaction dates *before* January 14, 1985, with posting of the transactions delayed by the merchants until after the January 14, 1985 cut-off date for the account.

**3.** Ms. Quick testified that in October 1984 she was earning a net income of $600 per month from part-time employment when she and Mr.

Quick separated. Upon separation, he voluntarily paid her $500 per month for support, which increased her income to $1,100 per month. She testified that her living expenses, excluding debt repayment, ranged from $1,100 to $1,300 per month. Citibank established that the minimum monthly payments on all her credit card obligations in October 1984 totaled $1,700.06.

1. The length of time between the charges made and the filing of bankruptcy;

2. The number of charges made, the nature of goods or services charged and the amount of such charges;

3. Consultation with an attorney about filing for bankruptcy;

4. The financial condition of the defendant at the time the charges were made; and,

5. Whether the charges were above the credit limit of the account. (citation omitted). Plaintiff's Trial Brief, p. 7.

Citibank emphasizes Ms. Quick's frequent use of the card within the ninety-day period and cites to multiple invoices from the same vendor on the same date as evidence of that fraudulent intent.

In rebuttal, Ms. Quick testified that the multiple charges resulted when she made purchases from various departments of a large department store, or when she used her cards to pay the "tabs" on a "line of credit" that was given her by the owner of a restaurant she frequented. She also had multiple charges at a beauty supply house from which she purchased supplies, in an attempt to get her manicuring business re-established.

Moreover, she affirmatively stated that when she made the Citibank charges, she intended to pay them. She testified that she expected $5,000 from an insurance settlement for a burglary, and expected to receive some money from joint checking accounts, a savings account and savings bonds held by her and Mr. Quick. Further, she testified that she expected an income tax refund which the parties had used in the past to pay bills.

The Court finds, that without other evidence of fraudulent intent, Ms. Quick's explanation of the multiple charges is plausible. Her explanation, when considered with her testimony concerning the expected source of repayment of those charges, persuades this Court that no basis exists to infer a fraudulent intent not to pay those charges when she made them. The Court is aware of the extreme difficulty of proving subjective intent. Although an inference of fraud may be drawn in some cases from those factors enumerated in plaintiff's trial brief, after considering all the facts and circumstances of the case at bar, the Court declines to draw that inference.

This Memorandum Decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. A separate judgment will be entered in accordance with this Memorandum Decision.