In re Terry Patrick WARD, Debtor,

**MANUFACTURER'S HANOVER TRUST COMPANY, Plaintiff–Appellant,**

v.

**Terry Patrick WARD, Defendant–Appellee.**

No. 87–3525.

United States Court of Appeals, Sixth Circuit.

Argued March 4, 1988.

Decided Sept. 16, 1988.

William R. Mapother (argued), James Adrian Earhart, Louisville, Ky., for plaintiff-appellant.

E. Hanlin Bavely (argued), Cincinnati, Ohio, for defendant-appellee.

Before ENGEL, Chief Judge *, and MERRITT and KRUPANSKY, Circuit Judges.

KRUPANSKY, Circuit Judge.

The claim at bar arises from the Chapter 7 bankruptcy proceeding of the defendant-appellee Terry Patrick Ward (Ward). Plaintiff-Appellant Manufacturers Hanover Trust Company (MHT) seeks to except from discharge indebtedness incurred by Ward as a result of his use of a Mastercard which it purportedly issued as a result of false representations made by Ward in his application for the credit card. The bankruptcy court concluded and the district court agreed that MHT's debt was dischargeable. MHT timely appealed.

Ward received the credit card in question upon completion of an application circulated by MHT as part of a nationwide direct mail solicitation sponsored by MHT to enroll new members in its retail consumer credit business. Ward received his credit card from MHT in May of 1985 with a preapproved credit limit of $2,000. During a 23-day period beginning on May 13, 1985, and ending on June 5, 1985, he charged $2,200 to this account. The charges included two cash advances of $900 each. MHT admitted that it requested no financial statement from Ward, nor did it conduct a credit check of his financial responsibility, which would have disclosed indebtedness on at least twelve other credit accounts together with an embezzlement conviction ordering a restitution of $250,000. MHT's

---

* The Honorable Albert J. Engel assumed the   duties of Chief Judge effective April 1, 1988.

principal witness, Louise Cordeira, assistant manager in charge of retail credit cards, testified that MHT generally requested a credit bureau report which, if received, would have reflected many of Ward's other liabilities. However, MHT introduced no evidence to support a request for or the receipt of a report concerning Ward.

After Ward filed his Chapter 7 petition, MHT instituted this proceeding seeking to declare his indebtedness to it as non-dischargeable under Bankruptcy Code Section 523(a)(2)(A) because the money was obtained by "false representation or actual fraud".[1] To support its position, MHT argued that Ward fraudulently misrepresented that he was financially responsible and would satisfy any and all charges that he incurred against MHT's extended credit. Appellee responded that the debt was dischargeable because MHT had assumed the risk of nonpayment of Ward's charges against its credit card since it had failed to minimally investigate Ward's financial responsibility.

To except a debt from discharge under § 523(a)(2)(A), a creditor must prove the following elements set forth in *In re Phillips*, 804 F.2d 930, 932 (6th Cir.1986):

[T]he creditor must prove that the debtor obtained money through a material misrepresentation that at the time the debtor knew was false or made with gross recklessness as to its truth. The creditor must also prove the debtor's intent to deceive. Moreover, the creditor must prove that it reasonably relied on the false representation and that its reliance was the proximate cause of loss. *In re Kimzey*, 761 F.2d 421, 423 (7th Cir.1985); *In re Hagedorn*, 25 B.R. 666, 668 (Bankr.

S.D.Ohio 1982); 3 Collier on Bankruptcy ¶ 523.08[4] (15th ed. 1985).

In the instant case, it was undisputed that Ward at least impliedly misrepresented his financial capability upon the application circulated by MHT and that he did so intending to deceive MHT. The lower court concluded, however, that the creditor did not "reasonably" rely on Ward's false representations because it failed to verify Ward's credit or to investigate the veracity of his representations. MHT, as the party seeking an exception from discharge in bankruptcy, had the burden to prove reliance by clear and convincing evidence. *Phillips*, 804 F.2d at 932; *Parkey*, 790 F.2d at 491. Exceptions to dischargeability are to be construed strictly. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *In re Hunter*, 780 F.2d 1577, 1579 (11th Cir.1986). In this context, the bankruptcy court's finding of fact is subject to a clearly erroneous standard of review by this court. *Phillips*, 804 F.2d at 932; *Knoxville Teachers Credit Union v. Parkey*, 790 F.2d 490 (6th Cir.1986); *In re Martin*, 761 F.2d 1163, 1165 (6th Cir.1985).

The bankruptcy court decided in pertinent part that:

The fact is that this company, Manufacturers Hanover, one of the largest banks in the United States, issued two thousand dollars in preapproved credit to a person who was not only hopelessly insolvent, but who had recently been convicted of an embezzlement offense.

While the testimony of the bank officer, the assistant manager in charge of retail credit cards indicated that a credit check must have been made, indeed, the contrary must be true. A credit check could never have been made, because if it

---

1. 11 U.S.C. § 523(a)(2)(A) provides:

(a) A discharge under Section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition,

(iii) or which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

had been made credit would not have been issued. If, in fact, the credit check was made, someone didn't heed it. ... So as far as I'm concerned, there could not have been [a] credit check.

In disposing of the controversy before it, the court apparently assigned Cordeira's testimony little, if any, credibility in light of her vague and inconclusive recollections concerning MHT's efforts to obtain a credit bureau report or otherwise investigate Ward's financial responsibility. In short, MHT failed to meet its burden of introducing clear and convincing evidence that it conducted even the most superficial credit investigation. Accordingly, the trial court's factual determinations were not clearly erroneous.

Given the correctness of the district court's factual findings, MHT's reliance on Ward's misrepresentation was unreasonable as a matter of law. "Congress was [when passing § 523] ... concerned that creditors use, when feasible, 'other sources of information, such as credit bureau reports, to verify the accuracy of the [debtor's] list of debts.'" *In re Martin,* 761 F.2d at 1166. *See also* H.R.REP. No. 595, 95th Cong., 1st Sess. 130 (1977), *reprinted in* 1978 U.S.CODE CONG. & ADMIN. NEWS 5787, 5963, 6091. In cases where "minimal investigation and verification almost certainly would have uncovered the falsity of the representations," a bank's

debt must be discharged if no such investigation had been performed. *In re Mullet,* 817 F.2d 677, 680 (10th Cir.1987). "Misplaced trust" is insufficient for nondischargeability. A lender must investigate creditworthiness and ferret out ordinary credit information. *In re Hunter,* 780 F.2d 1577, 1580 (11th Cir.1986). *Cf. In re Lansford,* 822 F.2d 902, 904 (9th Cir.1987) (assuming that a creditor bears a duty to investigate and verify a debtor's financial statement) (citing *Kentile Floors, Inc. v. Winham,* 440 F.2d 1128, 1131–32 (9th Cir. 1971)). Since MHT made "no attempt to ascertain what [Ward's] ability to pay might have been *before* it issued the cards," the debt is dischargeable. *In re Quick,* 70 B.R. 562 (Bankr.S.D.Cal.1987).[2]

This requirement that a credit check be performed best advances the policy of the Bankruptcy Act. As one commentator explained:

[F]rom the perspective of the bankruptcy proceeding, it is inequitable to reward a possibly imprudent creditor who failed to detect the debtor's misrepresentation by excepting her debt from discharge, while the debtor's other more prudent creditors have their claims evaluated collectively. As a matter of fairness among creditors, it is inappropriate to allow a creditor who is likely to have been imprudent to participate in the liquidation of the debtor's assets.

---

**2.** Numerous bankruptcy court cases stand for the proposition that a bank must conduct a reasonable investigation as to the accuracy of the debtor's representations. *See e.g. In re Mitchell,* 70 B.R. 524, 528 (Bankr.N.D.Ill.1987) ("commercial lenders ... are required to conduct a commercially reasonable investigation of the information that has been supplied by a debtor"); *In re Iverson,* 66 B.R. 219, 226 (Bankr. D.Utah 1986) ("it is well-settled that a creditor has a duty to check the credit rating of the debtor and not rely upon just the financial statement."); *In re Rosel,* 63 B.R. 603, 606 (Bankr.W. D.Ky.1986) (where no effort was made by bank to verify accuracy or existence of listed debts or assets, creditor's reliance unreasonable); *In re Reder,* 60 B.R. 529, 538 (Bankr.D.Minn.1986) ("If a creditor fails to even minimally investigate the information contained in a debtor's financial statement, such a failure will be *prima facie* evidence that the creditor's reliance on that financial statement was unreasonable."); *In re Bright,* 57 B.R. 233, 235 (Bankr.N.D.Ohio

1986) (creditor bears duty to make reasonable inquiry as to information provided by financial statement); *In re Kleinoeder,* 56 B.R. 77, 78 (Bankr.N.D.Ohio 1985) (same); *In re Aycott,* 54 B.R. 578, 582 (Bankr.E.D.N.Y.1985) ("Reasonable reliance has not been found when a creditor failed to verify or investigate information given on a financial statement."); *In re Bridges,* 51 B.R. 85 (Bankr.W.D.Ky.1985) ("A creditor who ignores available information or who fails to seek information from sources that are commonly used should not be heard to complain about the debtor's fraud."); *In re Hagedorn,* 25 B.R. 666 (Bankr.S.D.Ohio 1982) ("plaintiff cannot conduct business without due care and then maintain that as a result of deception it extended credit"). *See also Zaretsky, The Fraud Exception to Discharge Under the New Bankruptcy Code,* 53 Am.Bankr.L.J. 253, 262 (1979) (if creditor fails to verify debtor's statements, "it is the creditor's failure *to* comport with normal business practices, *not* the debtor's fraud, that is the true cause of the loss.").

Zeigler, *The Fraud Exception to Discharge in Bankruptcy: A Reappraisal,* 38 Stan.L.Rev. 891, 907–08 (Feb.1986).

Far from generating additional credit card fraud, as the dissent has suggested, this court's decision will encourage banks to more prudently investigate the creditworthiness of high-risk borrowers and will deter potential debtors from engaging in credit card fraud. As one commentator correctly observed, disallowing a bank's non-dischargeability claim when the bank fails to investigate would best comport with the intent of Congress and would discourage fraudulent credit transactions. Filipow, *Creditor Acquiescence as a Defense to an Exception to Discharge in Bankruptcy,* 58 Ind. L.J. 319, 331–34 (1983).[3]

MHT and the dissent have also charged that, assuming arguendo an unreasonable initial issuance of credit, such action was nevertheless irrelevant because the bank reasonably relied upon Ward's implied assurances that he would discharge each indebtedness incurred against MHT's line of credit which resulted from the use of the MHT Mastercard. Indeed, decisions such as *In re Doggett,* 75 B.R. 789, 791 (Bankr. S.D.Ohio 1987) and *In re Pannell,* 27 B.R. 298 (Bankr.E.D.N.Y.1983) support the proposition that a credit card holder impliedly represents to the bank that he is willing and able to pay the incurred indebtedness *each time* he uses the card.

However, even if each credit card charge constituted a "representation" of ability to pay, the case law and legislative history make it clear that a credit check must be conducted at some point; otherwise an exception to discharge is unavailable. A contrary rule would "place credit card companies in a special category of creditors and makes their [credit card] debts too easily nondischargeable." *In re Carpenter,* 53 B.R. 724, 728 (Bankr.N.D.Ga.1985). This court rejects extending preferential protection, at the expense of other unsecured creditors, to credit card companies which

profit from extending consumer credit at the risk of non-payment, which risk is factored into finance charges which are higher than the rates charged by other lenders. "Banks are willing to risk non-payment of [credit card] debts because that risk is factored into the finance charges. Because the risk is voluntary and calculated," Section 523 should not be construed to afford credit card issuers more protection than is given to all other creditors. *See First National Bank of Mobile v. Roddenberry,* 701 F.2d 927, 932 (11th Cir.1983).

MHT's negligent reliance upon Ward's application for credit and on Ward's unsupported "implied representation" constituted an assumption of the risk that Ward would fail to pay his subsequent credit card bills. "[W]hen a credit card company issues a credit card with no credit check of the applicant it has made a calculated business decision to assume the risk of nonpayment. Such a company cannot now turn to this Court and ask for special consideration because the debt owed is being discharged in bankruptcy." *Carpenter,* 53 B.R. at 729. That assumption of risk "continues until it is clearly shown that the bank unequivocally and unconditionally revoked the right of the cardholder to further possession and use of the card." *Roddenberry,* 701 F.2d at 932; *Carpenter,* 53 B.R. at 729. Since MHT did not revoke Ward's card until after the charges in question had been incurred, MHT assumed the risk that Ward would default on such charges. *See also In re Shrader,* 55 B.R. 608, 612 (Bkrtcy W.D.Va. 1985) (credit card issuers must effectively monitor their accounts; until bank decides to revoke credit card, voluntary assumption of risk of default continues).

It was unreasonable for MHT to rely upon Ward's mere signature, his supposed "good faith," and his "implied promise of repayment." As the court explained in *Hunter,* 780 F.2d at 1580, "misplaced trust" is insufficient for nondischargeabili-

---

**3.** At any rate, criminal law, rather than bankruptcy law, should be the primary deterrent to credit card fraud. The vast majority of consumer-debtors are unaware of the specific provisions of bankruptcy law and cannot be deterred

by changes in dischargeability requirements. *See* 1 J. Fonseca & P. Teachout, *Handling Consumer Credit Cases,* 428 (2d ed. 1980); Ziegler, 38 *Stan.L.Rev.* at 902 n. 49–50.

ty. A lender must investigate creditworthiness and ferret out ordinary credit information. *Id.* Reliance on Ward's signature was unreasonable and the § 523 exception to discharge, which this court is constrained to construe narrowly, *Gleason*, 236 U.S. at 562, 35 S.Ct. at 289, is unavailable to MHT.

Accordingly, the judgment of the district court is AFFIRMED.

MERRITT, Circuit Judge, dissenting.

The essence of the decision here, as well as the decision in *First National Bank of Mobile v. Roddenberry*, 701 F.2d 927 (11th Cir.1983), and other similar decisions cited by the Court, is found in the Court's statement that the issuing bank's "reliance" on the holder's "misrepresentation [of his intent to pay the Master Card charges] was unreasonable as a matter of law." (Op., p. 1084) "Reliance" is said to be "unreasonable" because the bank ran no credit check on its holders. Without a credit investigation, the bank was "unreasonable" to expect or assume that any particular cardholder's promise to reimburse the bank was made honestly and in good faith. According to the Court, it is "negligent" to rely only on statistics that a high percentage of Master Card holders will act honestly to repay their debts and to cover losses from untruthful promises by dishonest debtors by charging all cardholders a higher rate of interest. There can be no reliance because the "risk is factored into the finance charges." Opin. 1085. Without a credit check, the bank "assumes the risk" of dishonesty. *Id.* Thus, the Court holds that these "negligent" banks do not rely on the truthfulness or honesty of any particular debtor's promises. The line of reasoning concludes that the element of "reliance" is absent and thus there can be no nondischargeable "fraud" under § 523(a)(2)(A) of the Bankruptcy Code.

The Court made its first mistake in its first paragraph by assuming that the cardholder, Ward, made representations or promises on which the bank relied when he applied for the card in the fall of 1984. It assumes incorrectly that a contract was formed based on these representations when the bank issued the card. The Court states—contrary to the facts of the case—that the card was "issued as a result of false representations made by Ward in his application for the credit cards" and that "it was undisputed that Ward ... misrepresented his financial capability upon the application ... intending to deceive." Opin. 1083. The application contained only a few pieces of information, as follows:

Terry P. Ward
821 Exmoor Drive   HANOVER TRUST
                   MasterCard card
Cincinnati, OH 45240 immediately!
                              Approved
                   $2000.00 Credit Line
Offer Expires: November 2, 1984

App. 80. The credit cardholder misrepresented nothing at this point. The credit cardholder made no representations, and no contract was made when the bank "issued" the card later. When the card was issued, it was accompanied by a form containing stipulations concerning the use of the card, the calculation of finance charges and the fact that the bank may terminate the credit arrangement at will. App. 74–75.

The Court, like the Eleventh Circuit in *Roddenberry, supra,* reasons that the negligent bank's "unreasonable reliance" on the holder's conduct and intent takes place at the time it approves the application and issues the credit card, rather than at the time the credit card is used and the bank is required to pay the third party supplier. Since the bank assumed the risk of nonpayment by the holder, the bank's payment of the holder's purchases does not constitute reliance.

This characterization is based on an incorrect analysis of the contractual relationship. When an issuer of a credit card, like MasterCard, Visa or American Express, sends to the holder the card and the form describing the terms for its use, it makes "an offer [for] ... the formation of a number of contracts by successive acceptances from time to time," as the card is used. Restatement (Second) of Contracts § 31 (1981). "A standard example of a divisible offer is the continuing guaranty, the promise to guarantee performance of obligations of a specified type as a third party may

incur to the offeree from time to time." *Id.*, Comment b. The credit card relationship, properly analyzed, should be viewed as an offer by the issuer to create the opportunity for a series of unilateral contracts which are actually formed when the holder uses the credit card to buy goods or services or to obtain cash.

The several state courts which have analyzed the contractual relationship with care have adopted this line of reasoning. They hold that a contract is not formed when a credit card is issued but rather unilateral contracts are formed each time the card is used. *Garber v. Harris*, 104 Ill.App.3d 675, 60 Ill.Dec. 410, 412–13, 432 N.E.2d 1309, 1311–12 (1982); *Novack v. Cities Service Oil Co.*, 149 N.J.Super. 542, 374 A.2d 89 (1977); *City Stores Co. v. Henderson*, 116 Ga.App. 114, 156 S.E.2d 818, 823 (1967).

No bilateral contract is formed when the card is issued, as the Court appears to suggest. Thus the questions of fraud and reliance turn on the honesty of the cardholder's intent and of the holder's representations made at the time the card is used, not when it is issued. Most bankruptcy courts which have considered this issue have adopted this same reasoning and have held that the cardholder makes an implied representation at the time he uses the card that he has the ability and intent to pay the issuing bank for his purchases. *See In re Dougherty*, 84 B.R. 653, 17 B.C.D. 590, 592 (9th Cir. BAP 1988); *In re Faulk*, 69 B.R. 743, 752 (Bankr.N.D.Ind.1986); *American Bank and Trust Co. v. Lipsey*, 41 B.R. 255 (Bankr.E.D.Pa.1984). The Court does not allude to or attempt to answer this argument.

In the instant case, the Bankruptcy Court found that the cardholder had a dishonest intent not to pay and acted in bad faith when he used the card. App. 69. Obviously, the issuing bank "relied" on the holder's good faith use of the card because it paid the debt created when the card was used. *See In re Turner*, 23 B.R. 681, 685 (Bankr.D.Mass.1982); *Matter of Schnore*, 13 B.R. 249, 257 (Bankr.W.D.Wis.1981). In traditional contract terms, the issuing bank *changed its position* by making payment in the *expectation* of reimbursement by the cardholder debtor who *profited at the bank's expense.* Thus all three of the interests—change of position, expectation, and restitutionary unjust enrichment—that underlie the reliance concept are present. *See* Fuller and Perdue, *The Reliance Interest in Contract Damages*, 46 Yale L.J. 52, 54 (1936). Neither does the Court allude to or attempt to answer this argument concerning the fundamental elements of reliance.

The three party nature of the credit card arrangement may appear on the surface to affect the analysis of the issuing bank's reliance. Three parties are involved in a credit card transaction—the issuer, holder and supplier—and each of them has separate obligations. *See generally* Maffly and McDonald, *The Tripartite Credit Card Transaction: A Legal Infant*, 48 Calif.L. Rev. 459 (1960); Wohl, *Three Party Credit Card Transactions: Legal Rights and Duties*, U.C. Davis L.Rev. 357 (1969). In a sense, the issuing bank may have a preexisting duty, via an agreement, to pay the supplier for the holder's purchase regardless of the holder's intent. But the fact that the issuing bank may have a preexisting duty does not alter the fact that the bank relied on the holder's honesty in paying the third party. A preexisting duty to a third party creditor on a guaranty does not alter the reliance of a guarantor on the principal debtor's promise to reimburse the guarantor. *See* Restatement (Second) of Contracts §§ 73, 88. There is no reason this principle of contract law respecting payments to a third party should be changed in the credit card context.

Thus the issuing bank relied on the holder's dishonest representation of his intent to pay when the MasterCard was used. All the elements of dishonesty and fraud under this Circuit's recent interpretation of § 523(a)(2)(A) of the Bankruptcy Code in *In re Phillips*, 804 F.2d 930, 933 (6th Cir. 1986), are present, and the debt should not be discharged. To hold otherwise is to alter the fundamental principle of contract law that contracting parties are entitled to assume and rely on the good faith and honesty of those with whom they deal in the marketplace. "Every contract imposes

upon each party a duty of good faith and fair dealing in its enforcement." Restatement (Second) of Contracts § 205; *see also* Uniform Commercial Code § 1–203 (same). The effect of the Court's decision, unfortunately, is to reward dishonesty and bad faith in the making of contracts.

The Court's additional point that the bank factors into its interest rate and finance charges the risk of loss from dishonesty and nonpayment does not alter the analysis. Lenders normally factor into their finance charges the risk of loss along with the nominal rate of interest applicable to the duration of the particular loan in question. This is true whether the loan is to the government, a blue-chip corporation or a consumer. The Court does not deal with this fact.

The Court's observation that the bank "assumed the risk" of dishonesty and therefore could not rely on the cardholder's implied promise of repayment (Opin. 1085) improperly imports a tort concept into contract theory. Contract theory puts the question in terms of "actual reliance" and "justifiable reliance." Here there was actual reliance on the cardholder's good faith just as in other contract arrangements. There is no evidence or information presented in the record that would lead to the view that issuers of credit cards may not rely on the good faith of the promisor in extending credit. The idea that lenders may not rely on a definite promise of repayment in the absence of particular credit information has no precedent in contract theory and should not be adopted. The Court's interpretation of the Bankruptcy Code is completely contrary to the historical development of contract law.

The Court's last point, that a contrary rule on discharge in bankruptcy prefers credit card issuers to other creditors (Opin. 1085), is also mistaken. Any other creditor whose extension of credit was induced by fraud will receive the same treatment accorded the credit card issuer. Section 523(a)(2)(A) on discharge distinguishes between transactions based on fraud and other transactions. All credit induced by fraud receives the same treatment. The Court does not try to deal with this obvious inconsistency in its argument.

Finally, it should be pointed out that the Court's analysis would lead logically to the unsound conclusion that there was no consideration "bargained for" between the issuing bank and a particular MasterCard holder, and therefore no obligation or contract was formed when the holder used the card to secure a benefit in a transaction with a third party supplier or in a transaction directly with the issuing bank. If the issuing bank may not rely on a particular holder's implied promise to pay when the MasterCard is issued, there is no valid consideration for the contract and hence no enforceable obligation.

It is elementary that in order for there to be a contract there must be an "exchange of consideration": "To constitute consideration, a performance or a return promise must be bargained for." Restatement (Second) Contracts § 71. If there is no reliance or expectation that a particular promise or performance by a contracting party will take place, the consideration—in the language of the Restatement of Contracts—is not "bargained for" because

the consideration and the promise bear a reciprocal relation of motive or inducement: the consideration induces the making of the promise and the promise induces the furnishing of the consideration.... [A] mere pretense of bargain does not suffice, as where there is a false recital of consideration or where the purported consideration is merely nominal. In such cases there is no consideration and the promise is enforced, if at all, as a promise binding without consideration....

*Id.* at Comment b.

Unless there is some consideration other than the cardholder's promised intent to pay when the card is used, consideration is missing, and the contract is voidable. Here there was no other consideration in the form of an application fee or other payment made when the card was issued. The only consideration was the consumer's promise to pay which the Court holds may not be relied on as part of the bargained for exchange.

Thus the ingredient of "reliance" on a representation which supports one of the

elements of fraud is essentially the same ingredient that supports the "bargained for" element of consideration. If reliance is missing, consideration is missing. The reciprocal relationship necessary for a contract does not exist. There is no debt on a contract, and the credit cardholder has no contractual duty to pay, only perhaps a restitutionary or other noncontractual duty. Again the Court does not attempt to deal with the inconsistency of its argument in this respect.

Many holders of the 250,000,000 American Express, MasterCard and VISA cards in the United States, *see* New York Times, Sunday, June 26, 1988, p. 23F, will be happy to know that all they have to do to avoid paying their just credit card debts to the issuing bank in the future is to develop a present intent not to pay any of the debts incurred by using their cards. The logical result of the Court's reasoning that issuing banks do not rely on the honesty of the debtor in the absence of a credit check is that consideration is missing; and the contract is, therefore, voidable. Such a result would undermine credit cards as a medium of exchange and call into serious question billions of dollars of consumer and other indebtedness.

For the reasons set out above, the Court's reasoning and analysis should be rejected.