KRUPANSKY, Circuit Judge,
concurring.
I concur in the majority’s disposition in concluding that the bankruptcy court focused myopically on the objective unreasonableness of Rembert’s gambling, and then erroneously imputed an intent to defraud Citibank and AT & T to Rembert despite her acknowledged plan to win money — enough money to repay her credit card indebtedness — by continuing to gamble. Cf. Milwaukee Auction Galleries Ltd. v. Chalk, 13 F.3d 1107, 1109 (7th Cir.1994) (“[Njonperformance is not enough to ground ... an inference [of fraudulent intent]; there must be additional evidence of the defendant’s intentions at the time he made the promise.”). Nevertheless, I write separately to distinguish between the analysis previously employed by this court and the rationale impressed by the Ninth Circuit in In re Anastas, 94 F.3d 1280 (9th Cir.1996), upon which the majority opinion relies.
In In re Ward, 857 F.2d 1082 (6th Cir.1988), this court explained that the “initial issuance of credit” provides the critical moment at which a potential credit card holder represents an individual ability or intent to repay incurred.indebtedness and the relevant lending institution elects to rely upon or reject such representation. Id. at 1085; see id. at 1087 (Merritt, J., dissenting) (criticizing the majority for arriving at its conclusion). The court in Ward affirmed a bankruptcy court’s judgment that a debtor’s obligation to a credit card company was properly dis-chargeable absent any evidence that the company “conducted even the most superficial credit investigation” when the debtor applied for and received a credit card based upon false and fraudulent statements. Id. at 1084. Although the court discussed the probability that “each credit card charge [could] constitute] a ‘representation,’ ” independently capable of giving rise to an allegation of fraud, it discounted that probability by observing that “credit card companies ... profit from extending [revolving] consumer credit at the risk -of non-payment, which risk is factored into finance charges which are higher than the rates charged by other lenders.” Id. While not foreclosing the possibility that a credit card holder could impliedly represent to a lending institution his intent and ability “to pay the incurred indebtedness each time he uses the card,” rather than only when he initially applies for the card, the court explained that “a credit check must be conducted at some point; otherwise an exception to discharge is unavailable.” Id. at 1085.
In the instant case, the majority has adopted the rationale articulated in Anastas and elected to recognize the kind of credit card fraud urged by the dissent and tentatively rejected by the majority in Ward. See Maj. op. at 281. Consequently, when Rem-bert engaged in each, individual transaction using her cards, she necessarily and concomitantly manifested “either an actual or implied intent to repay the debt incurred.” Maj. op. at 281. This acknowledgment, in itself, is not objectionable to precedent. See Ward 857 F.2d at 11085 (leaving open the possibility that such a cause' of action could exist). Nevertheless, the majority’s silence with respect to the balance of the fraud inquiry implicitly calls the remainder of the Ward mandate into question.
The fundamental pronouncement of Ward required that “[a] lender must investigate *284 creditworthiness and ferret out ordinary credit information” as a precondition to preventing the discharge of debts allegedly procured by fraud. Id. at 1086. Accordingly, Ward would require a lending institution to show justified reliance on any alleged misrepresentation by the card holder in her individual transactions only by demonstrating that it had made routine or periodic credit investigations of her continued creditworthiness following the initial, pre-approved extension of her credit line. This analysis comports with the law of this circuit regarding the elements of fraud. See In re Phillips, 804 F.2d 930, 932-33 (6th Cir.1986) (recognizing the need for reasonable reliance on the part of the lender), overruled in part by Field v. Mans, 516 U.S. 59, 72-75, 116 S.Ct. 437, 444-46, 133 L.Ed.2d 351 (1995) (substituting “justifiable” for “reasonable” reliance). Moreover, it serves as a prudential rule that does not usurp the autonomy of lending institutions, which may elect to assume “the risk of non-payment, which risk is factored into finance charges which are higher than the rates charged by other lenders.” Ward, 857 F.2d at 1085; see First Nat’l Bank of Mobile v. Roddenberry, 701 F.2d 927, 932 (11th Cir.1983) (“[Ojnee credit is extended, the bank must decide when and if credit will be revoked. It is not the function of the courts to determine when a bank ought to revoke credit.”) (emphasis added).
Although these principles enjoy continuing vitality in this forum, the circuit that decided Anastas — the case which provides the substantive anchor for the majority’s rationale— does not require a creditor to investigate the credit-worthiness of its credit card holder beyond the initial review conducted at the time it extended credit to demonstrate justified reliance upon the implied representations made for the each subsequent transaction of the customer. See In re Eashai, 87 F.3d 1082, 1091-2 (9th Cir.1996). But see id. at 1093 (O’Scannlain, J., concurring) (“[T]he credit card issuer is not entirely blameless .... ”). Because the majority resolved the instant controversy by approving of the district court’s conclusion that Rembert made no misrepresentation, it did not need to address the justification for her creditors’ reliance on her representations. Although this omission constitutes a proper exercise in prudential adjudication, I write separately to emphasize that the majority’s silence should not be read to embrace the Ninth Circuit’s analysis of reliance in cases of alleged credit card fraud. The view articulated in Eashai conflicts with the decree of Ward, which remains the controlling precedent in this court.