**In re Donald Lee LARSON, Jr. and Donna Lee Larson, Debtors.**

**OHIO SAVINGS BANK, Plaintiff,**

v.

**Donald Lee LARSON, Jr. and Donna Lee Larson, Defendants.**

Bankruptcy No. 2-88-03610.
Adv. No. 2-88-0282.

United States Bankruptcy Court,
S.D.Ohio, E.D.

July 18, 1989.
Motion to Amend Judgment Denied
Sept. 12, 1989.*

* See 103 B.R. 896.

Timothy A. Riedel, Arter & Hadden, Columbus, Ohio, for plaintiff.

James Edward Morris, Columbus, Ohio, for defendants.

Larry E. Staats, Columbus, Ohio, Chapter 7 Trustee.

Charles M. Caldwell, Office of the United States Trustee, Columbus, Ohio, U.S. Trustee.

## OPINION AND ORDER ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

R. GUY COLE, Jr., Bankruptcy Judge.

This matter is before the Court following trial of a complaint filed by Ohio Savings Bank ("OSB"). The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding which the Court may hear and determine in accordance with 28 U.S.C. § 157(b)(1) and (2)(I).

### I. *Statement of Facts*

Debtor, Donald Larson, is employed as a foreman for a moving and excavation business at an annual wage exceeding $20,000. His wife, Donna Larson, is unable to work and since 1974 has been classified under workers' compensation laws as temporarily and totally disabled. Mrs. Larson is a homemaker and the primary caretaker of the debtors' three children. She also handles the family's financial affairs; her husband simply delivers his paycheck to her and she pays the bills.

Mrs. Larson has always paid the family's bills in a timely fashion; in fact, she often submitted installment payments prior to the due date or prepaid family obligations. Then, in 1988, her brother found himself in financial difficulty. To save her brother from possible eviction and loss of a truck, she and her husband agreed to serve as co-signers and/or guarantors of some of the brother's obligations. Mrs. Larson's brother eventually advised her that he was unwilling or unable to pay the co-signed and/or guaranteed obligations and that the debtors would have to assume responsibility.

As a result, debtors filed a voluntary petition under Chapter 7 of the Bankruptcy Code on July 18, 1988. In November, 1987, prior to filing the petition, debtors received in the mail an unsolicited offer from OSB captioned "Preferred Customer VISA or Mastercard Pre–Approved Certificate." The solicitation established a pre-approved "credit line" of $3,000. It also permitted debtors to select either a VISA or Mastercard account. Debtors opted for a VISA account and checked the box requesting a "Quick Cash" advance in the sum of $3,000. Debtors intended to consolidate a number of outstanding obligations by obtaining the VISA credit card account and accepting the accompanying $3,000 credit line. Consolidation of debts was a topic the debtors had been discussing when they received the solicitation.

The VISA card arrived on January 27, 1988. Upon receipt of the card, Mrs. Larson traveled to Society Bank and completed a cash advance request—which clearly was permitted under the cardholder agreement—in the sum of $2,900. She requested $2,900 so as not to exceed the $3,000 credit limit. The bank teller conducted a review by computer of Mrs. Larson's account, obtained telephone authorization to disburse the check, and then handed her a check for $2,900. Debtors used the cash advance to pay off other debts that carried higher interest rates. At the time the $2,900 cash advance was obtained, Debtors clearly had the ability to repay OSB because Mr. Larson earned between $1,600 per month in gross income and $400 per week in net income (the difference representing a conflict in the testimony), plus overtime pay. Mrs. Larson received disability income totaling $448 per month plus an additional $14 per month from the Social Security Administration. Mrs. Larson carefully reviewed the family budget and was convinced that she could make the minimum monthly payments required under the VISA cardholder agreement. She also believed she could eventually satisfy the entire debt.

Debtors had never before owned such a sophisticated credit card and were truly confused about the account's cash advance component. Debtors were surprised and confused when, not long after they obtained the $2,900 advance, they received in the mail a $3,000 check from OSB made payable to them. Mrs. Larson was reluctant to cash the check because she knew it exceeded the pre-approved $3,000 credit limit. Accordingly, she placed the check in a file cabinet pending an explanation from OSB. When the debtors received their first billing from OSB, it indicated that the debtors had obtained a cash advance in the amount of $3,000 on January 26, 1988—the date on which that check was mailed to debtors—and an additional cash advance in the amount of $2,900. The billing statement also included an "over limit charge" in the amount of five dollars. There was no notice on the billing statement, nor did debtors ever receive any indication, that they had violated their accountholder agreement or that OSB intended to revoke the account; to the contrary, the billing statement simply indicated that the debtors' account balance, including several minor purchases, totaled $6,036.54 and that a minimum payment of $302 was due shortly.

In reliance on the billing statement, and OSB's stated agreement to allow debtors to pay $302 per month on the aforementioned debt, Mrs. Larson traveled to Society Bank and cashed the check. As before, the bank teller conducted a review of the account and received appropriate approval to cash the check. Mrs. Larson used the proceeds of the check to consolidate a number of additional obligations, including J.C. Penney, Mastercard, Sears, certain doctor bills, and auto insurance. OSB did not cancel the check between January 27, 1988, when the $2,900 advance was obtained, and February 22, when the $3,000 check was cashed. Nor did OSB complain about the debtors exceeding their credit line. Rather, OSB continued during the ensuing months to bill debtors and include a monthly excess credit line charge of five dollars. OSB made no effort to revoke the card or cancel the account. In short, OSB never took, nor communicated an intention to take, adverse action in connection with

debtors' account as a result of debtors exceeding their credit limit.

The debtors clearly intended to repay OSB. In fact, they made minimum monthly payments, without objection from OSB, until approximately June, 1988, when Mrs. Larson underwent major surgery and her brother defaulted upon the co-signed and/or guaranteed obligations. It was at this time, after meeting with legal counsel and their pastor, that the debtors realized that bankruptcy was their only alternative. Nevertheless, when the debtors opened the account with OSB and obtained a cash advance and subsequently cashed the $3,000 check, they had the ability to repay these debts to OSB, including the monthly minimum payments. This is true even if Debtor was only earning $1,500–$1,600 in gross income at the time of application (By 1988, his gross income had increased to over $20,000). Had it not been for the brother's default, debtors probably would not have filed bankruptcy and likely would still be paying OSB in accordance with the cardholder agreement. As Mrs. Larson noted with pride, she and her husband had always maintained an excellent credit rating.

On October 25, 1988, OSB filed its complaint to determine dischargeability. The complaint alleges that debtors' obligation to OSB, totaling $5,343.01, should be held nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6). Specifically, OSB asserts that the debtors incurred the debt for money, property, services or an extension of credit by false pretenses, false representations and/or actual fraud. OSB also claims that the debtors have willfully and maliciously injured plaintiff and its property.

The debtors deny OSB's allegations and assert that they had both the ability and intention to repay their debt to OSB. They acknowledge the credit limit of $3,000, but note that the check cashed in late February, 1988, was not negotiated until it appeared from the billing statement that OSB approved the $3,000 advance as well as the $2,900. Debtors candidly admit their confusion, but deny any ill motives. In further support of their defense, they cite plaintiff's apparent acceptance of their over-limit advances and their submission of regular monthly payments to OSB aggregating almost $1,100.

## II. *Legal Discussion*

■ The Sixth Circuit has stated that in order to find a debt nondischargeable under § 523(a)(2)(A) the creditor must prove the following: (1) a representation was made by the debtor that was material, (2) the representation was false or was made with gross disregard as to its truth, (3) the debtor intended to deceive, (4) the creditor reasonably relied on the false representation, and (5) the creditor suffered a loss. See, *e.g., Coman v. Phillips (In re Phillips)*, 804 F.2d 930 (6th Cir.1986). OSB must prove its allegations by clear and convincing evidence. *Id.* Clear and convincing evidence is an intermediate standard of proof in which the evidence establishes a fact to a lesser degree than beyond a reasonable doubt, but establishes a fact to a greater degree than by a mere preponderance of the evidence. In other words, clear and convincing evidence consists of evidence which establishes in the mind of the trier of fact "a firm belief or conviction as to the allegations sought to be established." *First National Bank of Cincinnati v. Hagedorn (In re Hagedorn)*, 25 B.R. 666, 668 (Bankr.S.D.Ohio 1982); *Hobson v. Eaton*, 399 F.2d 781, 784 n. 2 (6th Cir.1968), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1189, 22 L.Ed.2d 459 (1969).

■ As noted by Judge Newsome, "[t]he concept of credit card fraud does not fit neatly within [the *Phillips* test], since the use of credit cards normally does not involve express misrepresentations." *Hagedorn*, 25 B.R. at 668. Thus, courts have held that the presentation of a credit card and signing a receipt constitute a representation of intent to repay, and if the cardholder had no intention at the time of purchase of paying for the goods, such behavior is fraudulent. *Manufacturers Hanover Trust Company v. Pannell (In re Pannell)*, 27 B.R. 298, 302 (Bankr.E.D.N.Y. 1983). Stated otherwise, the court can find fraudulent conduct by implication based upon circumstantial evidence.

Several courts have enumerated a list of factors to be used as a guide in determining a cardholder's intent. Representative of these courts is *Sears Roebuck v. Faulk (In re Faulk)*, 69 B.R. 743, 757 (Bankr.N.D. Ind.1986), in which the bankruptcy court set forth the following list:

(1) the length of time between the charges made and the filing of bankruptcy;

(2) whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

(3) the number of charges made;

(4) the amount of the charges;

(5) the financial condition of the debtor at the time the charges are made;

(6) whether the charges were above the credit limit of the account;

(7) whether the debtor made multiple charges on the same day;

(8) whether or not the debtor was employed;

(9) the debtor's prospects for employment;

(10) the financial sophistication of the debtor;

(11) whether there was a sudden change in the debtor's buying habits; and

(12) whether the purchases were made for luxuries or necessities.

*See also Greenwood Trust Company v. Barger (In re Barger)*, 85 B.R. 756, 761 (Bankr.S.D. Ohio 1988). Having considered the factors set forth in *Faulk* and *Barger*, and examined the record as a whole, it is readily apparent that OSB has fallen far short of proving its case under 11 U.S.C. § 523(a)(2)(A). Specifically, the Court does not find that the debtors made a representation that was false or made with gross disregard as to its truth. Nor does the Court find that the debtors intended to deceive OSB. To the contrary, the Court finds that, at the time the obligations in question were incurred, the debtors had the ability and intent to repay the entire debt due OSB.

Both of the debtors were exceedingly honest and credible witnesses. Having heard cases of this sort on numerous occasions, the Court has no small amount of experience in identifying debtors who have been less than honest in their dealings with creditors. That is not the case here. In this instance, the debtors were clearly authorized to charge or obtain a cash advance in the amount of $3,000. Thus, the initial cash advance of $2,900 was unquestionably proper and within the designated credit line. The record establishes that the debtors had both the intention and ability to repay that amount—perhaps not in one lump sum payment, but by making minimum monthly payments.

At first blush, debtors' asserted confusion about the $3,000 check might appear disingenuous. Surely, they suspected, or should have suspected, that the check was issued in error—that it was probably issued before OSB had received notice of the $2,900 advance. However, after observing the debtors and their demeanor, including their lack of sophistication and comprehension about the operation of this sort of account, the Court is convinced that the debtors were not acting fraudulently or under false pretenses.

Debtors must have suspected there was a foul-up on OSB's part, but they were not certain. Even if OSB had issued the $3,000 check in error, the debtors probably hoped OSB would permit them to retain the check and its proceeds. Had they wished to defraud OSB, the debtors probably would have rushed to cash the check. Instead, they stored it away at home awaiting some explanation—or cancellation—by OSB. When the billing statement arrived, it showed cash advances of $3,000 *and* $2,900, and application of a five dollar excess credit line charge. The statement gave no indication of any impropriety on debtors' part nor of OSB's intention to take adverse action. The billing statement simply requested a minimum payment of $302 with a full balance of $6,036.54 being due. At that point, and only at that point, did debtors conclude that it was appropriate to negotiate the $3,000 check.

Notwithstanding OSB's assertions to the contrary, the facts adduced at trial do not

establish the requisite fraudulent or malicious intent necessary to render the debt to OSB nondischargeable. Measuring debtors' conduct by the factors articulated in *Faulk* and *Barger*, the Court concludes that the debtors did not intend to deceive or commit fraud in connection with their debts to OSB. Notably, the debts were incurred some six months prior to the filing of bankruptcy and were followed by monthly payments on the account. The charges were not numerous and were made at a time when debtors were earning sufficient income to service the debt. Although one of the two advances exceeded the credit limit, debtors believed, in essence, that OSB had waived the credit limit. Both debtors received monthly income and were relatively unsophisticated. The advances clearly were not made for luxury items, but were used for the consolidation of existing, ordinary bills. And, finally, it was not unreasonable for the debtors to hold the $3,000 check, wait for the monthly statement, and rely upon it to cash the check and apply its proceeds to their own purposes. In sum, there is no appreciable evidence which would support a finding of nondischargeability and every indication that these debtors intended—and had the ability—to repay OSB.

■ Exceeding one's credit card limits is not *ipso facto* proof of intent to obtain money or property by false pretenses, false representation, or fraud in violation of 11 U.S.C. § 523(a)(2)(A). *First National Bank v. Wright (In re Wright)*, 8 B.R. 625, 628 (Bankr.S.D.Ohio 1981). It is merely one of many factors to be considered. *See Faulk, supra.* In this case, the debtors knew they were exceeding their credit line but believed, quite reasonably, that the bank had waived the limit. It has been held that:

> The issuer of a credit card must make a choice. If it intends to rely upon an agreed charge limit, it must advise the holder of the card, who exceeds the limit, that he is not to continue to incur additional charges until he has made payments to get under his charge limit. If the Bank does not do so, it in effect waives the right to contend that charges

incurred in excess of the stated limit constitute obtaining property by false representation or false pretenses.

*Ohio Citizens Bank v. Satterfield (In re Satterfield)*, 25 B.R. 554, 561 (Bankr.N.D. Ohio 1982), (quoting *Manufacturers National Bank v. Curcio (In re Curcio)*, 1 B.R. 727 (Bankr.E.D.Mich.1979)). Here, OSB waived any argument it may have regarding the propriety of debtors' exceeding the credit line. OSB did not advise the debtors that they had violated their cardholder agreement by exceeding the credit line or that they were required to cease using the account. Nor did OSB attempt to cancel the $3,000 check or revoke the card. Instead, OSB simply assessed a monthly charge for the over-limit charges and permitted continued use of the card. OSB also accepted $1,093 in regular, monthly payments on the debtors' account between February and July, 1988.

■ OSB also claims that it was willfully and maliciously damaged by the debtor's incurrence of the debts at issue. Section 523(a)(6) of the Code provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> . . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity; . . . .

The leading cases in the Sixth Circuit interpreting 11 U.S.C. § 523(a)(6) are *Wheeler v. Laudani*, 783 F.2d 610 (6th Cir.1986) and *Perkins v. Scharffe*, 817 F.2d 392 (6th Cir. 1987). These cases hold that "willful" means "deliberate" or "intentional", and that an action under § 523(a)(6) requires the intentional doing of an act that necessarily leads to injury. Hatred, spite, ill will and specific intent need not be established.

In the case before the Court, the evidence clearly contraverts the allegations of OSB. There is no evidence supporting, or even suggesting, that the debtors willfully and maliciously harmed OSB or its property. Debtors' conduct falls far short of approaching that standard. As noted

above, these were debtors of honest intentions and motives. Accordingly, OSB's claim for relief under 11 U.S.C. § 523(a)(6) must be denied.

Based upon the foregoing, the debt owing by debtors to OSB in the sum of $5,348.01, including other claimed costs and/or interest, is hereby determined to be dischargeable. Accordingly, judgment on the complaint is hereby entered in favor of defendants and against plaintiff.

IT IS SO ORDERED.