In re Russell F. WEST, Deborah E. West, Debtors.

NORWEST FINANCIAL OHIO, INC., Plaintiff,

v.

Russell Frederick WEST, Defendant.

ITT FINANCIAL SERVICES, Plaintiff,

v.

Russell Frederick WEST and Deborah Elaine West, Defendants.

Bankruptcy No. 2–88–05024.

Adv. Nos. 2–88–0309, 2–88–0310.

United States Bankruptcy Court, S.D. Ohio, E.D.

Oct. 30, 1989.

D.L. Mains, Jr., Columbus, Ohio, for Norwest Financial Ohio, Inc. and ITT Financial Services.

Mitchel D. Cohen, Columbus, Ohio, for debtors/defendants.

Charles M. Caldwell, Office of the U.S. Trustee, Columbus, Ohio, Asst. U.S. Trustee.

R. GUY COLE, Jr., Bankruptcy Judge.

### I. *Preliminary Matters*

Presently before the Court are two adversary proceedings to determine the dischargeability of debts in the bankruptcy case of Russell F. and Deborah E. West. In the first adversary proceeding, Norwest Financial Ohio, Inc. ("Norwest") filed a complaint against Russell F. West to except from discharge a debt pursuant to 11 U.S.C. § 523(a)(2)(A). The second adversary proceeding was brought by I.T.T. Financial Services ("ITT") against both debtors (collectively, the "Debtors") to adjudi-

cate the dischargeability of a debt in accordance with 11 U.S.C. § 523(a)(2)(B).

These matters were consolidated for trial purposes and heard by this Court on September 18, 1989. The Court has jurisdiction over the proceedings pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. These are core proceedings arising under 28 U.S.C. § 157(b)(1), and (2)(I). The following opinion constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule ("B.R.") 7052.

## II. *Statement of Facts*

1. The Debtors filed a joint petition under Chapter 7 of the Bankruptcy Code on October 31, 1988.

2. The Debtors purchased a waterbed from National Waterbed Warehouse on November 30, 1987, on a "90–day–same–as–cash" basis. ITT financed the purchase of the waterbed in the amount of $396.37.

3. On or about December 21, 1987, the Debtors applied for a loan from ITT for the purpose of consolidating their debts ("December Loan"). ITT required the Debtors to complete a document captioned "Financial Statement for Purpose of Obtaining a Loan or other Extension of Credit." To verify the information listed on this financial statement, ITT requested a credit check through the Columbus Credit Bureau. The information from the credit bureau report concerning the Debtors' outstanding obligations correlated with the information contained in the financial statement given to ITT by the Debtors. On December 21, 1987, the Debtors executed a "Disclosure Statement, Note and Security Agreement," pursuant to which they financed the sum of $3,062.63 with payments over a 37–month term totaling $4,490.68. ITT filed UCC–1 financing statements in order to perfect its security interest in the collateral described therein. The granting of the December Loan left the Debtors with two outstanding obligations: one owed to ITT and the other to G.M.A.C. on an automobile loan.

4. In April of 1988, Mrs. West sustained a work-related injury. Due to her injury, Mrs. West was required to make periodic visits to her doctor's office. To enable Mrs. West to make these visits, the Debtors purchased a 1988 Ford Escort financed through Bank One. The monthly payment owed on this vehicle is $171.

5. On May 5 or 6, 1988, Mr. West, in accordance with the terms of the December Loan, made a payment to ITT. The Debtors were current on the December Loan at the time this payment was made. On this same day, Mr. West executed a second "Disclosure Statement, Note, and Security Agreement" with ITT ("May Loan"). The May Loan was thereby consolidated with the December Loan and added the amount of $450 to the remaining balance on the December Loan. The financial statement portion of the application required the Debtors to list all of their outstanding debts. As Mr. West began completing this section—he had already listed GMAC and ITT—the ITT clerk assisting Mr. West advised him that completion of that portion of the application was unnecessary since all prior documentation from the December Loan application was still on file at ITT. Pursuant to the clerk's direction, Mr. West left the other outstanding obligations owed by himself and Mrs. West off the list. On May 10, 1988, ITT granted the Debtors' loan request without obtaining a credit bureau report verifying the information contained in the accompanying financial statement.

6. On May 20, 1988, the Debtors purchased an eleven-year old home through Veterans Administration ("V.A.") financing. The Debtors made no downpayment on the house, and, as a result, the monthly payments of $620 were approximately equal to the value of the home.

7. In June of 1988, a 1988 Nissan 200SX automobile was purchased and titled to Mr. West. The monthly payment on this automobile, including the premium for insurance, is $424.

8. On June 15, 1988, a 1988 Chevrolet Beretta was purchased by the Debtors and titled in Mr. West's name. The monthly payment owed by Debtors on this vehicle is $348.

9. On July 31, 1988, the Debtors purchased five items from Sun Television and Appliances, Inc. ("Sun TV"). Mr. West signed for and received an automatically-approved loan known as "instant credit," pursuant to which he purchased a dishwasher, microwave, car phone, grill, and stereo system (collectively the "Household Goods"). The instant credit loan was financed through Norwest, which purchased the account from Sun TV on September 9, 1988.

10. After July 31, 1988, Mr. West's work hours were reduced to 15 to 20 hours per week from his customary 40–hour work week. This cut-back dramatically decreased Mr. West's take-home pay. The reduction of Mr. West's work hours lasted throughout August, 1988.

11. Prior to entering into the May Loan with ITT and the instant credit transaction with Sun TV, the Debtors discussed their ability to meet the increased financial obligations represented by these purchases and loans. The Debtors concluded that their joint monthly income was sufficient to enable them to satisfy these obligations. At the time Debtors executed documents in connection with the May Loan and purchases from Sun TV, they possessed a sincere intent and ability to fulfill their financial responsibilities.

12. ITT would have issued the May Loan to the Debtors even if it had been fully apprised of the Debtors' other obligations. The information in the May Loan application was not relied upon in ITT's decision to grant the loan.

### III. *Legal Discussion*

#### A.

Norwest requests that the Court enter an order pursuant to 11 U.S.C. § 523(a)(2)(A), excepting from discharge the debt incurred through purchases made at Sun TV. Title 11 U.S.C. § 523(a)(2)(A) states, in relevant part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or insider's financial condition . . .

In an action brought pursuant to § 523(a)(2)(A), the plaintiff, Norwest, must demonstrate by clear and convincing evidence that Mr. West obtained the Household Goods from Sun TV by false pretenses, false representations, or actual fraud. *Coman v. Phillips (In re Phillips)*, 804 F.2d 930 (6th Cir.1986). In *Phillips*, the Sixth Circuit specified the following five criteria which must be satisfied in order to establish that a challenged debt is nondischargeable: (1) a representation was made by the debtor that was material, (2) the representation was false or was made with gross disregard as to its truth, (3) the debtor intended to deceive, (4) the creditor reasonably relied on the false representation, and (5) the creditor suffered a loss. *Phillips*, 804 F.2d at 932.

As stated, Norwest bears the burden of proving its allegations against the Debtors by clear and convincing evidence. The clear and convincing standard of proof is an intermediate standard which requires that the plaintiff establish a fact to lesser degree than beyond a reasonable doubt, but to a greater degree than by a mere preponderance of the evidence. Precisely stated, clear and convincing evidence consists of evidence which implants in the mind of the trier of fact "a firm belief or conviction as to the allegations sought to be established." *Hagedorn v. First Nat. Bank of Cincinnati (In re Hagedorn)*, 25 B.R. 666, 668 (1982); *Hobson v. Eaton*, 399 F.2d 781, 784 n. 2 (6th Cir.1968); *cert. denied*, 394 U.S. 928, 89 S.Ct. 1189, 22 L.Ed.2d 459 (1969).

In the case *sub judice*, there is no evidence that Mr. West, at the time he purchased the Household Goods from Sun TV, acted fraudulently or with gross disregard for the truth or that he intended to deceive Sun TV or Norwest. In fact, having examined the totality of the circum-

stances, Norwest falls far short of establishing the criteria necessary to except from discharge the debt incurred by Mr. West. Specifically, the Court does not find that, upon obtaining the instant credit from Sun TV, Mr. West, or his wife, made representations that were false, misleading, or made with gross disregard as to the truth. To the contrary, Debtors testified that prior to the time Mr. West purchased the Household Goods from Sun TV, they discussed their ability to meet this additional financial obligation. Based on their current monthly earnings, the Debtors believed that they would be able to repay the entire debt due to Norwest. The record is void of any evidence on the part of Mr. West, or his wife, to intentionally misrepresent their financial status to Norwest or to act in disregard of the truth.

The testimony elicited at the trial showed that Mr. West purchased the Household Goods from Sun TV on July 31, 1988. It was not until September 9, 1988, however, that Norwest purchased from Sun TV Mr. West's account. Between these two dates—July 31, 1988 until September 9, 1988—no notice to remit payments was ever sent to Mr. West. The testimony of Norwest's branch manager indicates that it was not until September 11, 1988, that a letter was sent to Mr. West notifying him as to where payments should be sent. During this interim period the Debtors encountered financial difficulties due to Mr. West's reduced work hours and Mrs. West's work-related injury. Shortly after receiving notice from Norwest of the address for payment, the Debtors realized their dire financial straits and proceeded to file a bankruptcy petition pursuant to Chapter 7 on October 3, 1988.

Both Debtors were credible and honest witnesses. Having heard numerous cases dealing with this exact issue, the Court is quite cognizant of debtors who are less than truthful in their dealings with creditors. Clearly, this is not the scenario presently before the Court. It is highly unlikely that the Debtors had the ability to foresee the unfortunate circumstances that were to occur to them. They had no way to predict, in advance, either the irregularity in Mr. West's work schedule or Mrs. West's injury. In fact, at the time the Debtors made their purchases from Sun TV, Mr. West had no difficulty in obtaining overtime work hours at his place of employment, Sears Distribution Center, and had obtained a second part-time job to supplement his income. The Debtors' joint monthly income amounted to approximately $2,000 per month when the goods were purchased in July. Their lack of foresight does not constitute false pretenses, false representation, or actual fraud. Although the Debtors may not have been able to repay the entire balance of their purchases in a lump sum, the record demonstrates that absent the unfortunate events occurring in August, the Debtors had not only the intent, but more importantly the ability, to make the $74.77 monthly payments to Norwest.

Norwest also argued that reliance on Mr. West's implied representations that he could and would pay for the purchased goods can be inferred. Even if the Court were to accept this argument, Norwest failed to prove its reliance, in extending instant credit to the Debtors, was reasonable. The Norwest branch manager, a Mr. Charles Rudd, testified that Norwest had entered into an agreement with Sun TV under which Norwest automatically approved instant credit to a prospective buyer if the buyer was able to show evidence of an existing credit card and home ownership. This Court rejects the suggestion that this instant credit relationship provides the quantum of reasonableness required under the Bankruptcy Code.[1] *See*

---

**1.** The court in *The May Co. v. Chech (In re Chech)*, 96 B.R. 781 (Bankr.N.D.Ohio 1988), found that a one-year credit relationship did not satisfy the reasonable reliance requirement in the extension of credit. The court stated that a one-year credit relationship between credit card issuer and credit card holder did not establish reasonable reliance on the part of the issuer on the card holder's implied representations that he had the ability and intention to pay for charges, incurred, in determining whether credit card debt was nondischargeable as one for credit incurred by false representation. *The May Co.*

*The May Co. v. Chech (In re Chech)*, 96 B.R. 781, 784 (Bankr.N.D.Ohio 1988). While, perhaps, a requirement that Norwest make a detailed inquiry into the credit history of each applicant would be impracticable, this Court believes that Norwest had a duty to uncover more information about Mr. West's financial condition before issuing the instant credit for purposes of § 523(a)(2)(A). Norwest can hardly complain about Mr. West's implied misrepresentations concerning his ability to pay and its reliance thereon if its requisites for granting the instant credit were mere proof of home ownership and the possession of another credit card. Accordingly, the Court finds that Norwest has not met the threshold requirements for relief pursuant to 11 U.S.C. § 523(a)(2)(A) to except from discharge $1,483.73 outstanding on Mr. West's account.

### B.

With respect to ITT, it claims that the Debtors intended to and, in fact, did deceive it in procuring their May Loan. ITT is alleging that Mr. West purposefully did not reveal his correct financial status at the time he completed the May Loan financial statement in order to convince ITT to extend further credit. ITT asserts that the debt should be declared nondischargeable as a result of ITT's reliance on a false financial statement. In rebuttal to ITT's allegation, the Debtors claim that the extension of additional credit was unilaterally offered to them by ITT and not requested. Mr. West argues further that while he was in the progress of listing the outstanding debts owed by Mrs. West and himself, the ITT clerk assisting him told him that completion of that section of the loan application was unnecessary since the December application, completed a mere five months earlier, provided an exhaustive listing of all financial obligations owed by the Debtors.

In determining whether the debt owed to ITT is nondischargeable, the governing provision concerning this matter is § 523(a)(2)(B). This section states, in relevant part as follows:

(a) A discharge under section 727, ... of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

. . . .

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; . . . .

The creditor, ITT, is responsible for establishing that each element listed in § 523(a)(2)(B) has been met in order for the debt to be deemed nondischargeable. It is axiomatic that the plaintiff has the burden of demonstrating compliance with each element of its claim by clear and convincing evidence. *Kentucky Bank & Trust Co. v. Duncan (In re Duncan)*, 35 B.R. 323 (Bankr.W.D.Ky.1983). In its analysis of the facts and law applicable to this case, the Court is guided by the principle that "exceptions to discharge must be narrowly construed." *Waterbury Community Fed. Credit Union v. Magnusson (In re Magnusson)*, 14 B.R. 662, 667 (Bankr.N.D.N.Y. 1981); *Bank One v. Huffman (In re Huffman)*, 45 B.R. 590, 595 (Bankr.N.D.Ohio 1984). The *Huffman* court stressed that this policy is followed because " 'the principles of the Bankruptcy Code generally, and the discharge provisions in particular, are to provide the honest but unfortunate debtor a new opportunity in life and a clear field for future effort.' " *Id.* (quoting *In re Patch*, 24 B.R. 563 (D.Md.1982)).

In viewing this case with respect to the four elements of 11 U.S.C. § 523(a)(2)(B), the Court finds that the financial statement completed by Mr. West, and signed by both Debtors, for the May

Loan extension was not materially false. While it is true that most of the Debtors' net income was allocated to meet financial obligations, this factor, standing alone, does not establish a violation of 11 U.S.C. § 523(a)(2)(B). ITT did not submit sufficient evidence to prove that the information listed on the financial statement by the Debtor was materially false on the day the application for the May Loan was completed. Although ITT presented evidence that the Debtors had purchased a home and three automobiles, the home and two of the cars were purchased *after* the Debtors were granted the May Loan. It appears, therefore, that the evidence with respect to these items is irrelevant as to whether the figures provided by Mr. West were false at the time the financial statement was completed on May 5 or 6 of 1988. In fact, the record, including the bankruptcy schedules, reflects that the two cars purchased after the May Loan were not financed solely by the Debtors. Both Debtors testified that the Chevrolet Beretta was purchased by Mr. West on behalf of his father, Russell West, Sr., who, in actuality, is paying for the car. The Nissan 200SX, purchased in June of 1988, is also being partially financed by the Debtor's father.

■ Even if ITT had established that the financial statement was materially false, it has failed to prove it relied on the Debtors' financial statement, as required by 11 U.S.C. § 523(a)(2)(B)(iii). This prong requires ITT to demonstrate it reasonably relied on the false financial statement in extending the $450 loan in May. Actual reliance on the financial statement can be established by merely providing evidence demonstrating that the loan would not have been granted if the lender had received accurate information. *Bank One v. Huffman (In re Huffman)*, 45 B.R. 590 (Bankr.N.D.Ohio 1984). The court record indicates that it was highly unlikely that the financial statement was a determining factor in ITT's decision to grant this small loan. The testimony of ITT's bankruptcy representative, a Ms. Deborah Fraley, unequivocally shows that the portion of the financial statement listing the current creditors of the debtors was not relied upon in determining whether to extend further credit.

Q. Assuming that when Mr. and Mrs. West came in in May of 1988 to renew and refinance the December '87 loan and borrow additional monies, if they had told you, about all of these items that they had not told you, would I.T.T. still have made the loan.

A. Probably not.

Hearing Transcript at 20.

As previously mentioned, ITT has the burden of proving by clear and convincing evidence that it relied on the financial statement, to its detriment, in making the May loan. ITT's response to this inquiry does not satisfy the applicable standard of proof. There was not a clear showing by ITT's representative that the loan extension request would have been rejected. To the contrary, her answer of "probably not" indicates that in fact ITT may still have extended the credit with knowledge of the debtors' other financial obligations. Thus, ITT's claim that it would not have extended the May loan to the debtors if it had knowledge of their other financial obligations is without merit.

■ Likewise, ITT did not rely on the Debtors' listing of creditors in the May application, because it already had what it believed to be a reasonably current list. The testimony clearly established that the Debtors failed to list all their creditors at the direction of an ITT representative. That representative told Mr. West that it was not necessary to list all debts since ITT had previously obtained this same information in December when the Debtors initially applied for a consolidation loan. Pursuant to the clerk's direction, Mr. West proceeded to list only those debts incurred since December 21, 1988. Mr. West's account is uncontroverted and credible; as such, the Court concludes that the events occurred as he stated.

Based upon the foregoing, the Court concludes that ITT has not demonstrated compliance with all the elements required by 11 U.S.C. § 523(a)(2)(B). Accordingly, the Court holds that the financial statement

presented to ITT in May of 1988 was not materially false and that the debt owing by the Debtors to ITT in the sum of $3,523.83, or such other sum as is alleged by ITT, is hereby determined to be dischargeable.

### C.

 The Debtors' answers to the complaints filed by Norwest and ITT asserted a separate counterclaim pursuant to 11 U.S.C. § 523(d), requesting that this Court award them costs and a reasonable attorney's fee for the proceeding. Section 11 U.S.C. § 523(d) was adopted in 1984 to provide protection to a consumer debtor that dealt honestly with the creditor who sought to have the debt excepted from discharge on the ground of falsity in the incurring of the debt. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 131 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. A debtor is entitled to costs of, and a reasonable attorney's fee for, a proceeding to determine the dischargeability of a debt under § 523(a)(2) when a creditor initiates the proceeding "if the court finds that the position of the creditor was not substantially justified," and if the debt is determined to be dischargeable. H.R.Rep. No. 595, 95th Cong., 1st Sess. 365 (1977).

As a preliminary matter, the Court notes that much consideration was given in determining whether costs and attorney's fees should be awarded to the Debtors. However, the case law coupled with the fact that the Debtors failed to restate their counterclaim at trial has led this Court to believe that such a request should be denied. A thorough review of the history and decisional authority governing this section indicates that a creditor's position in contesting dischargeability is not substantially justified when the creditor fails to establish a single necessary element of its claim. *See Thorp Credit, Inc. v. Smith (In re Smith)*, 54 B.R. 299 (Bankr.S.D.Iowa 1985); *Connecticut Nat. Bank v. Panaia*, 61 B.R. 959 (Bankr.D.Mass.1986); *Household Finance Corp. v. Van Buren (In re Van Buren)*, 66 B.R. 422 (S.D.Ohio 1986). From the evidence submitted at trial, the Court finds that both Norwest and ITT were substantially justified in alleging their claims. Although the creditors did not prevail on the merits of their claims, it appears to the Court that the creditors had a sound basis for bringing these suits, acted in good faith, and were not guilty of abusive practices in obtaining a false statement. *See* 3 *Collier on Bankruptcy*, Para. 523.12, 523–74 (15th Edition 1989). As such, the Debtors' request for costs and a reasonable attorney's fee pursuant to 11 U.S.C. § 523(d) shall be denied.

Based upon the foregoing, judgment is hereby awarded in favor of the defendants/debtors in both actions and against the plaintiffs.

IT IS SO ORDERED.