In re Violanta BURDGE, Debtor.

AT & T UNIVERSAL CARD SERVICES, Appellant,

v.

Violanta BURDGE, Appellee.

BAP No. NC–95–1498–MuMeR.

Bankruptcy No. 93–34864–WTC.

Adv. No. 94–3114–TC.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted March 15, 1996.

Decided June 25, 1996.

Anne L. Keck, Santa Rosa, CA, for Appellant.

Dean Lloyd, Palo Alto, CA, for Appellee.

Before: MUND [1], MEYERS and RUSSELL, Bankruptcy Judges.

1. Hon. Geraldine Mund, Bankruptcy Judge for the Central District of California, sitting by designation.

*OPINION*

MUND, Bankruptcy Judge:

## I. OVERVIEW

AT & T appeals the bankruptcy court's determination that only $4,000 of a credit card debt totaling $8,684.74 is non-dischargeable under 11 U.S.C. § 523(a)(2)(A). The remaining $4,684.74 [2] of the debt was held to be dischargeable because that portion was incurred after the creditor increased the credit limit, without investigating the debtor's financial condition. WE REVERSE.

## II. STATEMENT OF FACTS

The debtor, Violanta Burdge, filed a chapter 7 petition on November 8, 1993. On May 14, 1990, Burdge opened a credit card account with AT & T. Initially, the credit limit was $3,000, but was increased to $4,000. On August 5, 1993, AT & T increased the credit limit to $8,000. AT & T initiated the credit increase as a promotional measure.

A few months prior to the filing of bankruptcy, Burdge made forty-seven purchases, incurring large charges on her account. These charges occurred between July 17, 1993 and August 16, 1993, during which time Burdge made purchases of $4,937.84 and obtained cash advances of $3,320. Many of the purchases were for clothing, music equipment, concert tickets and restaurant charges. Burdge testified that she withdrew the cash advances to pay her monthly mortgage, which was approximately $1,200; however, the cash advances far exceeded her mortgage payment. The total charges and cash advances resulted in a balance of $8,684.74. Burdge did not make any payments on the account during or after July 17, 1993.

During oral argument, AT & T stated that, prior to the spending spree, Burdge had maintained a good credit record. Burdge had usually carried a nominal balance on the account; further, her account had a balance of zero immediately prior to the spending spree. The record does not refute or con-

firm AT & T's position on Burdge's prior payment history.

Burdge's net pay was $2,300 per month. Yet, according to her bankruptcy schedules, her monthly expenses, at a minimum, were approximately $2,229. Burdge's testimony revealed that it was likely that she had other expenses, beyond those reflected in the schedules. In fact, during her testimony, she admitted that she did not make enough income to pay all expenses, including her various credit card debts.

Burdge attempted to refinance her home. She testified that she made the charges in anticipation of obtaining the loan. However, she was unable to obtain refinancing. Further, she did not present evidence that a loan application was actually pending.

## III. PROCEDURAL HISTORY

On March 11, 1994, AT & T initiated an adversary proceeding against Burdge seeking a determination that the $8,684.74 debt be declared non-dischargeable under 11 U.S.C. § 523(a)(2)(A). The basis of the complaint was that Burdge did not have the intent to repay or did not have the ability to repay the debt. The trial was held on October 14, 1995. The bankruptcy court ruled that only $4,000 of the debt was non-dischargeable. The remaining $4,684.74 was held dischargeable because AT & T failed to investigate Burdge's creditworthiness before approving the credit increase to $8,000.

Thereafter, on March 16, 1995, AT & T filed an Amended Motion To Amend Judgment After Trial, seeking a modification of the order so that the entire debt of $8,684.74 would be declared non-dischargeable.[3] The bankruptcy court denied the motion. AT & T filed a Notice of Appeal on May 1, 1995.

## IV. ISSUE ON APPEAL

The issue is whether the bankruptcy court erred in ruling that a creditor's failure to investigate the debtor's creditworthiness prior to a credit increase precludes non-dis-

---

**2.** $4,000 was incurred on account of the credit increase; $684.74 is the amount incurred in excess of the credit limit.

**3.** AT & T requested that, at a minimum, the $684.74 portion of the debt, which was in excess of the $8,000 limit, be declared non-dischargeable. The bankruptcy court denied this request.

chargeability of a credit card debt under section 523(a)(2)(A).

## V. STANDARD OF REVIEW

 The bankruptcy court's findings of fact are reviewed under the clearly erroneous standard and conclusions of law are reviewed *de novo. In re Kirsh,* 973 F.2d 1454, 1456 (9th Cir.1992). There are no facts in dispute. The issue on appeal is whether a failure to investigate a debtor's creditworthiness prior to a credit increase prevents non-dischargeability of a credit card debt; therefore, this issue is a question of law and is to be reviewed *de novo. See id.*

## VI. DISCUSSION

 A credit card debt will be determined non-dischargeable if a plaintiff can meet all requirements of 11 U.S.C. § 523(a)(2)(A).[4] To satisfy section 523(a)(2)(A), the creditor must establish each of the following five elements:

(1) debtor made a material misrepresentation,

(2) with knowledge of its falsity,

(3) with the intent to deceive,

(4) on which the creditor justifiably relied, and

(5) due to which the creditor sustained loss or damage.

*In re Kirsh,* 973 F.2d 1454, 1457 (9th Cir. 1992) (per curiam); *In re Britton,* 950 F.2d

**4.** Section 523(a)(2)(A) provides that:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; . . .

**5.** 1. The length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3. The number of charges made;

4. The amount of the charges;

602, 604 (9th Cir.1991); *In re Lee,* 186 B.R. 695, 697–98 (9th Cir. BAP 1995). The proponent must prove each element by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 290–91, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

Most credit card dischargeability cases deal with the debtor's use of the card, not the creditor's creation or increase of the line of credit. As the debtor makes charges on the card, there is inherent difficulty in finding that the requirements of representation and reliance are met. *In re Dougherty,* 84 B.R. 653, 656 (9th Cir. BAP 1988). In recognition of this problem, the Panel in *Dougherty* held that a creditor can prevail if it establishes actual fraud by showing that the debtor made the charges without the intent of paying. *Id.* at 657. This intent can be established through a non-exclusive list of factors.[5]

The bankruptcy court found that the *Dougherty* factors[6] were satisfied in this case. This is demonstrated in the court's findings and conclusions, which are paraphrased from the transcripts as the following:

(1) Burdge underwent a sudden and substantial change in buying habits during the period at issue;

(2) The charges were not primarily for essentials, but were for clothing, travel, restaurants and a concert;

5. The financial condition of the debtor at the time the charges are made;

6. Whether the charges were above the credit limit of the account;

7. Whether the debtor made multiple charges on the same day;

8. Whether or not the debtor was unemployed;

9. The debtor's prospects for employment;

10. Financial sophistication of the debtor;

11. Whether there was a sudden change in the debtor's buying habits; and

12. Whether the purchases were made for luxuries or necessities. *Dougherty,* 84 B.R. at 657; *In re Eashai,* 167 B.R. 181, 184 (9th Cir. BAP 1994).

**6.** In the Ninth Circuit these criteria are generally referred to as the "Dougherty factors." However they are a restatement of items set forth in *In re Faulk,* 69 B.R. 743, 757 (Bankr.N.Ind.1986)

(3) Burdge went on a spending binge approximately three months prior to the petition date;

(4) The expenditures were well beyond Burdge's ability to repay them because she had virtually no disposable income to retire the debt; and

(5) Burdge's explanation that a loan application was pending is not justification for the spending binge.

The issue on appeal concerns whether the creditor had a duty to investigate the debtor's financial condition at the time that it increased credit. AT & T's appeal focuses on the bankruptcy court's reasoning that the later portion of the debt was dischargeable because AT & T had failed to investigate Burdge's creditworthiness before it increased her credit limit. AT & T contends that this decision is grounded in the assumption of risk doctrine and therefore is erroneous.

 Under the assumption of risk theory, the creditor assumes the risk of nonpayment until the card issuer revokes the credit card; if the debtor uses the card after revocation, the debts incurred during that period are non-dischargeable. *Dougherty*, 84 B.R. at 656; *In re Ward*, 857 F.2d 1082, 1084 (6th Cir.1988). According to this doctrine, a creditor assumes a risk if it fails to conduct an investigation of a debtor's financial condition prior to *issuing* a card. *Ward*, 857 F.2d at 1085. In *Ward*, the court applied the doctrine to a card issuance situation [7]; however, the court stated in *dictum* that if no initial investigation is made, there must be an investigation at some point or the exception to discharge is not available to the creditor. *Id.*

 We have previously rejected the assumption of risk doctrine in *Lee*. *Lee*, 186 B.R. 695. In *Lee*, the bankruptcy court denied a default judgment to the creditor on the ground that there was no evidence to satisfy the requirements of *Ward*. *Id.* at 699. We reversed and specifically held that

and were originally compiled in *Matter of Carpenter*, 53 B.R. 724, 730 (Bankr.N.Ga.1985).

**7.** In *Ward*, the credit card was issued in May 1985 and the spree began May 13, 1985, ending 23 days later.

*Ward* is not controlling law in this circuit. Although the facts of *Lee* concerned credit card usage rather than the initial granting of credit, the *Ward* opinion was framed in the context of both the issuance of a credit card and its use. To the extent that there is an argument to be made that *Lee* only applies to credit card usage, this is incorrect. *Ward* and its assumption of risk theory does not apply to either granting of credit by the creditor or to use of the credit card by the debtor. Therefore, no investigation is required prior to issuance of a credit card.

The issues to be resolved by this Panel are whether the recent opinion in *Field v. Mans*, —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), affects the ruling in *Lee* and whether there is a different rule which applies to increase of credit rather than to the initial issuance of a credit card.

## A. Implications of Field v. Mans

*Field v. Mans* concerned a conveyance of real property which should have triggered a due-on-sale clause. When the transferor (debtor) conveyed the property to a newly formed partnership, he concealed the transfer, but requested in writing that the lenders waive their due-on-sale rights so that a new principal could be added to his land development organization. The bankruptcy court applied a reasonableness standard and ruled that a reasonable person would have investigated whether a conveyance had taken place. However, the Supreme Court held that the standard of reliance under 11 U.S.C. § 523(a)(2)(A) is "justifiable reliance" and that the bankruptcy court should define "actual fraud" to include the elements required to prove common law fraud.[8] *Field v. Mans*, —— U.S. at ——, 116 S.Ct. at 443.

Under the common law, the duty to investigate impacts the justifiable reliance requirement. Generally, the duty to investigate is not imposed.[9] *See id.*, —— U.S. at ——, 116 S.Ct. at 444; *Kirsh*, 973 F.2d 1454. However,

**8.** This was already the law of the Ninth Circuit. *In re Kirsh*, 973 F.2d 1454 (9th Cir.1992).

**9.** The Supreme Court bases its discussion of duty to investigate and suspicious circumstances on Prosser's *Law of Torts*.

"[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." W. Prosser, Law of Torts 108, p. 718 (4th ed. 1971); accord, W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 108, p. 752 (5th ed. 1984) (Prosser & Keeton).

*Field v. Mans,* —— U.S. at ——, 116 S.Ct. at 444. As such, unless the qualities and characteristics of this particular appellant and the circumstances of this particular case warrant otherwise, it is improper to impose the duty to investigate on the creditor. *Id.*

### B. *Application of Standard to the Facts of This Case*

■ The circumstances in this case demonstrate that the mere fact that AT & T failed to investigate prior to increasing the credit limit does not render its reliance unjustified. In the past, Burdge had a good payment record, which demonstrated a responsible use of the charge card. The testimony of AT & T's investigation manager reflects that the first credit increase up to $4,000 was provided in light of her satisfactory payment history. There was also no evidence of credit card abuse after the first credit increase. There is no evidence that AT & T reviewed Burdge's payment record before raising the credit limit at issue.

Prior to the credit increase, AT & T was not aware of any circumstances to trigger doubt. Under the theory of common law fraud, knowledge of facts which should serve as a warning requires the creditor to investigate. On August 5, 1993, the date of the credit increase, Burdge had a posted balance of $5,513.20, which exceeded her $4,000 credit limit. This balance surpassed the $4,000 limit which was in effect until the increase on August 5, 1993. In other circumstances, the excessive balance might raise suspicions and warrant further investigation.[10] Yet, in this case, this fact did not trigger a duty to investigate because there was no evidence that AT & T was aware of the excessive balance at the time it decided to increase the $4,000 limit. In fact, the credit increase was provided automatically as part of a promotion. In sum, the bankruptcy court incorrectly found that AT & T had a duty to investigate and had failed to fulfill the duty.

### C. *Summary of Standard*

■ A creditor is not required to investigate prior to increasing the credit limit. However, if a creditor is aware of facts which, at a cursory glance, should alert that creditor to a possibility that the debtor either does not intend to pay for its debt or lacks the ability to pay its debt, the creditor must make reasonable inquiry before issuing the card or increasing the credit limit. *See Field v. Mans,* —— U.S. at ——, 116 S.Ct. at 444.

■ The above principle comports with the policy behind section 523(a)(2)(A). The purpose of providing a discharge is to afford the debtor with a fresh start. However, this goal is limited to honest debtors. *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991). Accordingly, the focus should not be on the improvident actions of a creditor, but on the improper actions of the debtor. *Dougherty,* 84 B.R. at 657. Requiring a card issuer to investigate each time it increases a credit limit would inappropriately provide debtors with an escape device to their own improper actions. *Lee,* 186 B.R. at 698.

■ When there is an ongoing satisfactory credit relationship between the debtor and the creditor, unless there are facts which are known to the creditor and which should have created a suspicion in the mind of that particular creditor, the creditor may increase the credit limit without conducting an investigation of the debtor's financial circumstances.

### VII. CONCLUSION

The bankruptcy court incorrectly determined that only $4,000 of the debt was non-dischargeable on the grounds that the creditor failed to conduct an investigation. AT &

---

**10.** On August 17, 1993, after the spending binge had ended, Burdge requested a further credit increase, which AT & T denied upon discovery of Burdge's excessive spending.

T was not under the duty to conduct a credit check prior to raising the credit limit. AT & T was able to meet the *Dougherty* standard, thus establishing that the debtor's conduct was fraudulent. We hold the entire debt to be non-dischargeable pursuant to § 523(a)(2)(A) and, therefore, the bankruptcy court's order is REVERSED to the extent it held that $4,684.74 of the debt was dischargeable.