**In re Jeannine Erin WILLIAMS A/K/A Jeannine Weiss, Debtor.**

**AT&T UNIVERSAL CARD SERVICES CORP., Plaintiff,**

**v.**

**Jeannine Erin WILLIAMS A/K/A Jeannine Weiss, Defendant.**

Bankruptcy No. 96–23802.
Adversary No. 97–2044.

United States Bankruptcy Court,
D. Connecticut.

Nov. 6, 1997.

Andrew K. Brotman, Brotman & Freedman, Stamford, CT, for Plaintiff.

Donna J. Brooks, Dixon & Brooks, P.C., Winsted, CT, for Defendant.

### MEMORANDUM OF DECISION ON COMPLAINT TO DETERMINE DISCHARGEABILITY

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

## I.

### ISSUE

AT&T Universal Card Services Corporation ("AT&T"), the plaintiff, has filed a complaint requesting the court to determine that a credit card debt of $4,516.79, owed to it by Jeannine Erin Williams, A/K/A Jeannine Weiss ("Williams"), the debtor, is nondischargeable, pursuant to Bankruptcy Code § 523(a)(2)(A)[1], as fraudulently obtained. AT&T also seeks costs and attorney's fees. AT&T, in its post-trial brief, limits its claim of nondischargeability to cash advances totalling $2,900.00. Williams' answer denied that she committed fraud. After a trial, the court concludes that AT&T having not satisfied its burden of proof, Williams' debt to AT&T is discharged.

## II.

### BACKGROUND

On June 7, 1993, Williams and her then husband, Robert Weiss ("Weiss") accepted AT&T's apparently unsolicited offer of $4,000.00 preapproved credit. *AT&T's Exh. 1.* When she filed her Chapter 7 petition on November 1, 1996, Williams owed AT&T $4,516.79, including accrued interest.

In January 1996, Williams lost her factory job when her employer was acquired by another company and her position eliminated. The following month, she and Weiss separated. Distressed by the news that Weiss intended to leave her, Williams attempted suicide. She was hospitalized as an inpatient for approximately a week in late February 1996 and attended an outpatient program during the entire month of March 1996.

Prior to the separation, Weiss had generally handled the couple's finances, depositing money into their joint account and telling Williams which checks to write. Williams had no independent source of income besides unemployment compensation after she lost her job. Because of her emotional state, she did not seek employment immediately after Weiss left. Williams could not seek full time work while enrolled in the outpatient program in March because it required her to be in the hospital from 9:00 a.m. to 3:00 p.m. Monday through Friday.

On February 1 and 2, 1996, Williams drew cash advances of $200 and $300, respectively, on the AT&T credit card. *AT&T's Exh. 4.* She obtained the cash for food, clothing, diapers, and formula for her child. Williams also made two AT&T card purchases totalling $97.56 in February and remitted a $25 payment. *Id.* She took a $2,400 cash advance on March 6, 1996, *Id.*, testifying that she drew the cash to have same money on hand in case she needed it. She feared that Weiss would entirely stop paying her bills and she would "end up in the street." She stored the cash in a dresser drawer and eventually used it to pay for food, gasoline, day care, and other basic living expenses.

After her discharge from the outpatient program at the end of March, Williams sought factory work but soon enrolled in a six-week training program to became a certi-

---

**1.** Section 523(a)(2)(A) provides:
  (a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

    ·    ·    ·    ·

  (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

  (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.... 11 U.S.C. § 523(a).

fied nurse's aide. She obtained her certification, sought employment, and found work at the end of June 1996. At the time of trial she worked at a nursing home. Once employed, Williams made payments on several other credit card accounts but not on her AT&T account.

In late June or July 1996, Williams learned that Weiss intended to file a Chapter 7 bankruptcy. At his urging, she accompanied him to consult an attorney on July 18, 1996. Both Williams and Weiss testified at trial that initially she did not intend to file bankruptcy and attended the attorney's consultation only to obtain information. The attorney's client intake form for that consultation states that Williams "was very clear that she didn't want to" file bankruptcy. *Williams' Exh. E.* At trial, Williams stated that she did not want to file because she "wanted to be responsible for [her] own bills." In a letter to the attorney dated July 26, 1996, Williams reiterated her unwillingness to file bankruptcy but also indicated that if she learned that she was liable for Weiss' debts on a Household Finance credit line, with an outstanding balance of approximately $10,000, and for a Citizens Bank loan, she would file. *Williams' Exh. D.* Upon learning that she was in fact jointly responsible for these debts, Williams, on November 1, 1996, filed her petition. Williams, in her pre-trial brief, but not in her pleadings, requests a judgment, pursuant to Code § 523(d), for her costs and reasonable attorney's fees because AT&T's complaint was not substantially justified.[2] *Williams' Trial Brief* at 7–9. AT&T does not address this contention in its Post–Trial Brief.

### III.

### DISCUSSION

#### A.

"Under § 523(a)(2)(A), 'a debt may be determined nondischargeable based on

fraud where the creditor proves that: (1) the debtor made the representations; (2) at the time he knew they were false; (3) he made them with the intention and purpose of deceiving the creditor; (4) the creditor relied on such representations; (5) the creditor sustained the alleged loss and damage as the proximate result of the representation having been made.'" *Harper v. Richey (In re Richey)*, 103 B.R. 25, 29 (Bankr.D.Conn.1989). The level of reliance is justifiable reliance. *See Field v. Mans*, 516 U.S. 59, ——, 116 S.Ct. 437, 446, 133 L.Ed.2d 351, 365 (1995). The burden of proof on the creditor is to prove each element of the statute by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991). Further, "'[e]xceptions to dischargeability are narrowly construed', an approach that implements the 'fresh start policy of the Bankruptcy Code.'" *National Union Fire Insurance Co. of Pittsburgh, Pa. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 300 (2d Cir.1996) (internal citations omitted). "To be actionable, the debtor's conduct must involve moral turpitude or intentional wrong; mere negligence, poor business judgment or fraud implied in law (which may exist without imputation of bad faith or immorality) is insufficient." *Smith v. Meyers (In re Schwartz & Meyers)*, 130 B.R. 416, 422 (Bankr.S.D.N.Y.1991).

The question of how to deal with "representations" that credit card holders make when they incur credit card charges has engendered substantial comment in recent court decisions. In general, courts hold credit card debts to be dischargeable absent a determination that the debtor did not intend to repay the charges when they were incurred. *See, e.g., AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr.W.D.Mo.1997).

#### B.

Applying these standards to the matter at hand, the court credits Williams' testi-

**2.** Section 523(d) provides:
(d) If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and reason- able attorneys fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

mony that when she withdrew the questioned cash advances from her AT&T credit line, she intended to repay her debts in full. When questioned at trial as to how she expected to repay these debts, Williams replied "I knew that I would get on my feet eventually." Her actions following her discharge from the outpatient program—completing a training program for nurse's aide certification and obtaining employment—support her claim that she intended to "get on her feet." Moreover, both her attorney's client intake form, indicating that Williams did not want to file, and Williams' subsequent letter to the attorney, reiterating that she would file only if she was liable on Weiss' debts, buttress her testimony that she intended to repay her debts.

Williams testified that she did not consider bankruptcy until the end of June at the earliest, nearly four months after she obtained the $2,400 cash advance. A four-month gap between the time she incurred the debt and the time she first considered filing, and an eight-month gap between the debt and the filing, do not suggest that Williams withdrew the cash intending to evade payment via a bankruptcy filing. *See AT&T Universal Card Services Corp. v. Acker (In re Acker)*, 207 B.R. 12, 18 (Bankr.M.D.Fla. 1997) (determining that the debtor intended to repay his credit card debt although he filed his bankruptcy petition twenty days after incurring charges); *First Card Services, Inc. v. Koop (In re Koop)*, 212 B.R. 106, 109 (Bankr.E.D.N.C.1997) (concluding that the debtor, who had relied on her husband to manage her financial affairs and pay bills, had no fraudulent motive when, after separating from her husband, she had obtained cash advances totalling $8,273.74 less than two months before filing).

AT&T argues that by choosing to repay several other creditors but not AT&T after she obtained a full-time job, Williams demonstrated her actual intent not to repay her AT&T debt. *AT&T's Post–Trial Brief* at 3. Williams testified that the bills she paid were *smaller* than the AT&T bill, and that she did not pay the latter because it was large. Williams' selective payment of debts does not indicate that she intended to defraud AT&T.

AT&T cites several cases that it contends supports its assertion that Williams committed fraud. The circumstances in the two decisions AT&T cites that found fraudulent intent differ from the facts before the court. In *Bank One Columbus N.A. v. (In re McDonald)*, 177 B.R. 212 (Bankr.E.D.Pa.1994), the court found credit card debt nondischargeable because it did not find credible the debtor's testimony that she had used her credit card for "survival" and was actively seeking employment at the time she incurred her debt. *Id.* at 216. Moreover, the debtor's actual use of the card clashed with her testimony that she used the card for "survival." *Id.* at 216–17. Similarly, in *AT&T Universal Card Services v. Burdge (In re Burdge)*, 198 B.R. 773 (9th Cir. BAP 1996), the debtor underwent a "sudden and substantial" change in buying habits, going on a "spending binge" that included travel, restaurant meals, and purchases of clothing, music equipment, and concert tickets approximately three months before filing bankruptcy. *Id.* at 775, 776–77. The third case cited, *AT&T Universal Card Services v. Grayson (In re Grayson)*, 199 B.R. 397 (Bankr.W.D.Mo. 1996), is inapposite.

The court concludes that AT&T has not met its burden of proving that Williams did not intend to repay her credit card debt at the time she incurred it, and that Williams' obligation to AT&T is dischargeable. In its Post–Trial Brief, AT&T additionally argues that the court should find Williams' debt nondischargeable under § 523(a)(2)(B) because she allegedly submitted a credit card application listing exaggerated incomes for her and Weiss. *AT&T's Post–Trial Brief* at 3–4. Because AT&T's complaint includes only one count under § 523(a)(2)(A), and does not mention § 523(a)(2)(B), the court does not consider the plaintiff's argument under § 523(a)(2)(B).

### IV.

### CONCLUSION

AT&T has failed to carry its burden of proof that Williams did not intend to repay her credit card debt and judgment shall enter for Williams that her debt to AT&T is

discharged. Williams may file a motion for her claim under § 523(d) within three weeks from date, accompanied by an affidavit itemizing the fees and costs sought. *See Peoples Bank v. Poirier (In re Poirier)*, 214 B.R. 53 (Bankr.D.Conn.1997).